RADIO CORPORATION OF AMERICA,
Plaintiff,

v.

PHILCO CORPORATION, Defendant.

Civ. No. 265–64.

United States District Court
D. New Jersey.

July 11, 1967.

Levy, Levy & Albert, by Philip J. Albert, Trenton, N. J., John Farley, New York City, A. Russinoff, Princeton, N. J., of counsel, for plaintiff.

Katzenbach, Gildea & Rudner, by Samuel Rudner, Trenton, N. J., Thomas M. Ferrill, Jr., Allen V. Hazeltine, Fordyce A. Bothwell, Philadelphia, Pa., of counsel, for defendant.

## OPINION

LANE, District Judge:

This is an action under 35 U.S.C. § 146 to review the decision of the United States Patent Office Board of Patent Interferences in an interference proceeding between Harold B. Law and John W. Tiley, and their respective assignees, Radio Corporation of America [hereinafter "RCA"] and Philco Corporation [hereinafter "Philco"].

Plaintiff, RCA, is a corporation organized and existing under the laws of the State of Delaware, and is licensed to do business in the State of New Jersey. Defendant, Philco, is a corporation organized and existing under the laws of the State of Delaware, and is licensed to do business in the State of New Jersey. Thus, this court has jurisdiction over the parties and venue is proper in this district.

On December 31, 1963, the Patent Office Board of Patent Interferences decided Interference No. 88,472, Tiley (Philco) v. Law (RCA), awarding priority of invention to Tiley. On February 25, 1964, Law appealed to the United States Court of Customs and Patent Appeals, pursuant to 35 U.S.C. § 141. On March 9, 1964, Tiley, pursuant to 35 U.S.C. § 141, filed with the Commissioner of Patents notice of election to have all further proceedings in this case conducted as provided in 35 U.S.C. § 146. On March 25, 1964, plaintiff, the assignee of and party in interest with respect to the Law patent application, brought the present action under 35 U.S.C. § 146 against defendant, the assignee of and party in interest with respect to the Tiley patent application.

Plaintiff seeks an adjudication that the decision of the Board of Patent Interferences was erroneous and that its assignor Law was the original and first inventor of the invention in issue, a method used in the manufacture of color television picture tubes.

In actions under 35 U.S.C. § 146, the issues are tried de novo and the evidence may include that which was introduced in the proceeding before the Patent Office as well as new materials. The specific question for determination, where, as here, the issue decided in the Patent Office was one between the contesting parties as to priority of invention, is whether or not all competent evidence, "new" and "old," offered to the district court carries "thorough conviction" that the Patent Office erred. Morgan v. Daniels, 153 U.S. 120, 125, 14 S.Ct. 772, 38 L.Ed. 657 (1894); Etten v. Lovell Manufacturing Company, 225 F.2d 844, 848 (3d Cir. 1955), cert. denied, 350 U.S. 966, 76 S.Ct. 435, 100 L.Ed. 839 (1956).

Plaintiff contends generally that the present state of the record in this court carries thorough conviction that the Patent Office erred in awarding priority of invention to Tiley rather than to Law. Plaintiff asserts that the record before the Patent Office was inadequate in that testimony is submitted to the Board only in deposition form and there is no opportunity to evaluate the candor and demeanor of the witnesses; that the documentary evidence presented to the Board with respect to the history of Philco's work in 1950 and 1951 consisted largely of documents selected by Philco itself from the Philco files; and that as a result of the broader discovery available in the district court other important documents from Philco's files bearing on the issues became available to plaintiff RCA for the first time subsequent to the Patent Office decision. The new evidence introduced here includes not only engineering records, but also testimony by expert witnesses at the trial who explained the statements contained in those records relating to various technical problems. In some instances the expert witnesses had themselves done or supervised work in the field of color television in the time period here of interest, and gave valuable and objective testimony as to this. The new evidence also includes testimony by deposition of a key witness, Meier Sadowsky, related to the issue of whether Tiley was an original independent inventor or whether he de-

rived the invention from Law through Sadowsky.

Defendant Philco contends that the record before this court does not carry thorough conviction that the Patent Office erred. It asserts that the additional evidence presented to this court is merely cumulative with that which was before the Board; that much of it consists of self-serving opinion evidence devoid of merit, and that some of it is barred since it relates to an issue not raised below. Stated positively, defendant Philco contends that the evidence in this case establishes that Tiley was first to conceive the invention, and was diligent from the conception not only to the demonstration in April, 1951, but also to his constructive reduction to practice on September 26, 1951; and that Tiley was first to reduce the invention to practice. Additionally, Philco contends that it is entitled to an award of priority on the ground that plaintiff's patent application here involved was improperly converted from a joint Law-Rosenthal application to a sole Law application, since no justification for such conversion was established as required by 35 U.S.C. § 116.

## GENERAL BACKGROUND

A number of corporations in the electronics industry had, immediately after World War II, participated in the development of black-and-white television, and in the latter part of 1946 commercial black-and-white sets were placed on the market. Increased interest was then shown and sustained effort expended in attempts to develop color television techniques, and in 1949 the Federal Communications Commission asked the electronics industry to propose standards for the development of color television in America.

The Columbia Broadcasting Company, one of the proponents of a color television system, devised a method involving the use of an ordinary black-and-white tube, producing a white picture, with a moving disk mounted in front of the white picture. The moving disk was fitted with red, green and blue filters, and with this combination Columbia was able to produce a color picture. The company attempted to make its color system compatible with a black-and-white system for transmission, but found the color picture it produced could not be received by an unmodified black-and-white receiver. Nor could a transmission of a conventional black-and-white picture be received by its color receiver without some modification. Thus, the Columbia system required two standards.

At an early date, RCA did demonstrate a completely engineered color television system in which electronic tubes were used. However, this system called for the use of three conventional cathode-ray tubes, one of which had a green phosphor, one a blue, and one a red, and they were combined with mirrors so that the viewer gained the impression of seeing the three in combination. This system was bulky, expensive, and somewhat impractical, and RCA felt that production of a single multicolor picture tube was necessary in order to gain Federal Communications Commission approval.

Thus, RCA, in September, 1949, inaugurated a crash program to develop a single color picture tube for use in demonstrating its system to the authorities in Washington, and Dr. Edward W. Herold headed this program. RCA undertook five different projects, that is, five different ways of producing a color picture. Two of them involved a so-called shadow-mask principle, and it was these two that were successfully demonstrated to the Federal Communications Commission on April 6, 1950. RCA also held a much-publicized demonstration at that time for the representatives of the television industry. These demonstrations included the broadcasting of live color television programs which were received on the RCA color television demonstration sets, and also received on black-and-white television sets located throughout the Washington area. As a result of these demonstrations the RCA principle of color and black-and-white transmission and reception compatability was eventually approved by the Federal Com-

munications Commission. Philco did not participate in this early Federal Communications Commission competition.

*Shadow-mask Tubes*

Shadow-mask tubes, the type plaintiff RCA used in its demonstrations in Washington in early 1950, are now in wide use in the color television industry. A shadow-mask tube includes, at the viewing end of the tube, a glass viewing screen having on its inside surface a pattern of many small, closely-spaced phosphor dots which emit colored light when struck by a beam of electrons. These dots are arranged in groups, each group including three phosphor dots ("triplets"), which respectively emit red, blue and green light. There is an apertured metal mask (the "shadow mask") inside the tube, near the viewing screen, which mask includes many holes, there being one mask hole for each group of three phosphor dots. In this type of tube three electron beams scan the mask and pass through the mask holes toward the phosphor screen. The three beams approach the mask at different angles, and, after passing through a mask hole, each beam can strike only the dot of the particular color phosphor (red, blue or green) which is allotted to that beam.

The mask used in RCA's tubes in 1950 was in the form of a perforated flat metal plate maintained by being held taut in a frame. The phosphor screen also was flat, being in the form of a glass plate bearing phosphor dots, mounted within the tube near the viewing end. (In the tube structure common today, the mask is *curved*, and the phosphor dots are located not on a separate glass plate, but, instead, are on the inside surface of the curved glass wall—face plate—at the viewing end of the tube.) In late 1949 and early 1950, RCA studied several types of color television picture tubes, but it was the shadow-mask type on which RCA did its principal work.

*Index Tubes*

In the latter part of 1949, Philco began to consider various possible methods of making color cathode-ray tubes. Most of the Philco work was done on the "index" type tube. In this tube there is no shadow mask.

In the index tube on which Philco worked, phosphor is deposited, not in dots, but in vertical lines, for emitting red, blue and green light, respectively. An electron beam scans horizontally across (at right angles to) the vertical phosphor lines. The electron beam is turned on and off at selected times, to determine the color of the light to be emitted by the screen. Thus, for example, if the beam is turned "on" as it passes across blue phosphor lines, it will cause blue light to be emitted.

In this tube, in addition to the phosphor lines, there are "index" lines of other material, having characteristics different from those of the phosphor lines. These index lines produce signals or voltages in response to the scanning of the electron beam. These voltages are fed back to circuits which control the tube, for the purpose of establishing a timed relationship between the movement of the electron beam and the electrical signals which apply the color information to the tube. Thus, when the electron beam is on the "blue" phosphor line, the "blue" information is applied to the electron beam. Philco's experimental index-type tube during the period August 1950–September 1953 was referred to by the code name "Apple" tube.

In Philco's tubes the material usually used in making the index lines was magnesium oxide (Mgo). The index signal was typically produced by the difference in the number of "secondary" electrons coming from the index lines and from the phosphor lines. Consequently, non-uniformities in the phosphor lines could produce non-uniformities in the index signal.

In Philco's early work, in late 1950 and well into 1951, its index tubes included only one electron beam. Later they included two beams, one for causing phosphor lines to emit light and the other for producing index signals.

Both the index tube and the shadow-mask tube require a screen having accurately defined phosphor patterns—

phosphor dots for a shadow-mask tube, and phosphor lines (strips) for an index tube. Although the shadow-mask tube has no index signal, it is constructed so that the paths of the electron beams are controlled and will pass through the holes of the mask at such angles that they will strike the desired phosphor dots.

### The Count of the Invention in Suit

The function of the count is to define the invention which is in issue. The count is:

"In the manufacture of a cathode ray tube having a screen structure comprising a light transparent base and phosphors fixed thereto emissive of light of different colors in response to electron bombardment, a method of applying phosphors including the following steps: depositing a photosensitive layer having a solubility inversely proportional to exposure thereof to light and comprising an organic gel, a photosensitizing material adapted to vary the solubility of the gel, and inorganic phosphor particles emissive of light of one color; selectively exposing to light the areas of the deposited layer where said phosphor particles are to be retained, so as to render the layer in said areas relatively insoluble by a solvent capable of dissolving the unexposed areas of the layer; subjecting the layer to said solvent to dissolve the layer in the unexposed areas; depositing a second layer having a solubility inversely proportional to exposure thereof to light and comprising an organic gel, a photosensitizing material adapted to vary the solubility of the gel, and inorganic phosphor particles emissive of light of a different color than the first-mentioned particles; selectively exposing to light areas of the second layer offset in relation to the first-mentioned areas, so as to render the exposed areas of the second layer relatively insoluble by a solvent capable of dissolving the unexposed areas of the second layer; subjecting the second layer to the solvent to dissolve the layer in the unexposed areas; and subsequently baking

the screen structure to remove the gel without affecting the inorganic phosphor particles."

The language of the count may be explained as follows:

"In the manufacture of a cathode ray tube having a screen structure comprising a light transparent base and phosphors fixed thereto emissive of light of different colors in response to electron bombardments, * * *."

The invention is a method used in manufacturing cathode ray tubes, typically color television picture tubes. The tube which is being manufactured has a screen including a pattern of phosphors supported on glass. The glass may be the curved wall of the tube at its viewing end. The phosphors, when struck by the electron beam of the tube, emit light of different colors, such as red, blue, green.

"* * * a method of applying the phosphors including the following steps: * * *."

The invention is a method of applying the phosphors to the glass surface of a cathode-ray tube.

"* * * depositing a photosensitive layer having a solubility inversely proportional to exposure thereof to light and comprising an organic gel, a photosensitizing material adapted to vary the solubility of the gel, and inorganic phosphor particles emissive of light of one color; * * *."

This means depositing (applying to the glass) a layer which, when exposed to light in certain areas, becomes hardened or insoluble in the exposed areas. The layer includes a gel, plus a material which causes the gel to be light-sensitive, plus phosphor particles. A gel is a semi-solid substance that may be jelly-like (as gelatin) or more or less rigid, formed by coagulation.

"* * * selectively exposing to light the areas of the deposited layer where said phosphor particles are to be retained, so as to render the layer in said areas relatively insoluble by a solvent capable of dissolving the unexposed areas of the layer; * * *."

This means exposing the layer to light in selected areas. These areas may, for example, be in the form of dots, or lines. A suitable optical pattern is used in making this exposure. For example, if phosphor dots are to be produced, the optical pattern will include dot-shaped holes. If phosphor lines are to be produced, the optical pattern will include strip-like transparent areas.

"* * * subjecting the layer to said solvent to dissolve the layer in the unexposed areas; * * *."

This means washing away the layer in its areas which were not exposed to light.

"* * * depositing a second layer having a solubility inversely proportional to exposure thereof to light and comprising an organic gel, a photosensitizing material adapted to vary the solubility of the gel, and inorganic phosphor particles emissive of light of a different color than the first-mentioned particles; selectively exposing to light areas of said second layer offset in relation to the first-mentioned areas, so as to render the exposed areas of the second layer relatively insoluble by a solvent capable of dissolving the unexposed areas of the second layer; subjecting the second layer to the solvent to dissolve the layer in the unexposed areas; * * *."

This means repeating the procedure, using a different phosphor, and exposing the layer in different areas, followed by washing away the layer in the unexposed areas. To make the usual three-color screen the procedure is repeated a third time with phosphor of a third color. The count specifies application of at least two different color phosphors.

"* * * and subsequently baking the screen structure to remove the gel without affecting the inorganic phosphor particles."

This means heating the screen structure so as to remove the gel but so as not to affect the phosphor particles.

*Back and Front Projection*

The count does not specify whether exposure to light is to be accomplished from the front of the glass plate upon which the photosensitive layers of phosphors are deposited (front projection) or from the back of the glass plate (back projection). It is established, however, that in the construction of a shadow-mask tube, "back projection" is the only feasible method of exposure to light; whereas, in Philco's early developmental work with a one-piece glass bulb, commencing in the latter months of 1950 and, indeed, continuing into 1953, the photosensitive layers of phosphors were deposited on the inner surface of the face plate and were exposed to light through the glass from the front of the plate (front projection).

In the manufacture of a shadow-mask tube, it is necessary to commence work with a separable glass bulb,—one piece of which consists of the face plate with an inch or two of rim, the second piece being the long funnel or cone section of the bulb. The inner surface of the face plate is thus open and accessible at its maximum diameter when the photosensitive layers of phosphors are deposited on it or on a glass plate mounted just inside the open face plate. With the use of a suitable optical pattern, or exposure mask, areas of the plate are directly exposed to light projected from a position in back of the face plate. The shadow mask is then installed in back of and in close proximity to the completed phosphor screen. Finally, the face plate section with its installations and the long funnel or cone section are sealed together to form an operating tube. This use of a separable bulb requiring sealing involves a considerable cost factor in manufacturing.

Because Philco worked with a one-piece glass bulb, the inner surface of the face plate was not readily accessible, and, in order to deposit photosensitive layers of phosphors and index strips on its inner surface, it was necessary to work blindly and without light through the small opening at the funnel or cone end of the bulb,—several inches removed from the inner surface of the plate. Further, it was necessary to accomplish the

exposure to light of portions of the photo-sensitive layers deposited in the inner surface of the face plate from the outside, or front, of the one-piece bulb. The arc light was positioned in front of the one-piece bulb with an exposure grating held between the light and the outer surface of the face plate, with the light penetrating the glass before reaching the photosensitive phosphor mix.

For approximately two and one-half years commencing in the summer of 1950, Philco worked on the development of a line index color picture tube containing a multicolored phosphor screen deposited by the method taught by the invention in issue. Philco's index tubes never reached the consumer market.

Until November of 1953, RCA worked with a "silk screen" or stencil-type process in making the phosphor screen used in its shadow-mask color television tubes. Then RCA commenced the development of a shadow-mask color television tube using a screen deposited by the method defined by the invention in issue. RCA achieved success within a period of four weeks.

## ALLEGED CONCEPTION, REDUCTION TO PRACTICE AND APPLICATION FILING DATES

Plaintiff RCA alleges that its assignor, Harold B. Law, conceived the invention on the 15th day of November, 1948.

Defendant Philco alleges that its assignor, John W. Tiley, conceived the invention on the 15th day of March, 1950.

Philco alleges it reduced the invention to practice in April, 1951.

The RCA patent application was filed on the 30th day of July, 1951, as a joint application of Law and Howard Rosenthal, RCA employees.

The Philco patent application was filed on the 26th day of September, 1951, in the name of John W. Tiley, a Philco employee.

The United States Patent Office declared the present interference on February 21, 1957.

## THE BOARD OF PATENT INTERFERENCES' CONCLUSIONS

The testimony taken in the interference proceeding was commenced on June 15, 1960, and was finally concluded on February 1, 1963. It amounted to over six thousand pages of printed testimony, and some two thousand pages of exhibits were introduced. The final hearing was held on September 30, 1963, and on December 31 the Board of Patent Interferences rendered its decision wherein it concluded:

"We therefore decline to enter judgment in favor of the party Tiley on the ground that the involved RCA owned application, now standing in the name of Law as sole inventor, is without standing in this proceeding.

"However, it having been found that Tiley conceived the invention of the count in interference by August 30, 1950 and reduced it to practice in April, 1951, prior to the filing date of the senior party, Law, and it having been found that Law did not actually reduce the invention to practice nor establish diligence from just prior to the entry of Tiley into the field, the junior party, Tiley, is entitled to prevail.

"Accordingly, priority of invention of the subject matter in issue in said count is hereby awarded to John W. Tiley, the junior party."

As to Law's alleged conception, the Board in its decision made the following observation:

"If the classic principles of conception are applied in the manner in which they were applied in Mergathaler v. Scudder, 11 App.D.C. 264; 1897 C.D. 724, through many cases down to Bac v. Loomis, 252 F.2d 571, 45 CCPA 807 (1958); we are inclined to agree with Tiley as to the inadequacy of the matter relied upon by Law to establish conception. The work by RCA with direct photo-deposition was thoroughly inquired into from Law's first notebook entry in 1949 up to the "crash program" instituted in 1953, about two

years after Rosenthal and Law filed their application. During this time the process described by Law in his notebooks was not used to try to make a single tube."

As to Tiley's alleged conception, the Board stated:

"We are of the opinion that Tiley has established possession of conception of the invention defined by the count in issue at least as early as August 30, 1950, when he taught the process to Payne for the purpose of enabling Payne to manufacture, at Lansdale, tubes to be used in the development of a color television system. No doubt Tiley had the idea earlier, as Bradley details the steps of the process as having been disclosed to him 'in the spring' of 1950. Bradley told Creamer about it and Creamer discussed the matter with Tiley 'about the end of July' 1950, and stated that 'at the time of our meetings in August we had knowledge of the photographic process and were quite anxious to make use of it at Lansdale in the processing of the color screens.' Bradley detailed the process but was not definite in date, and Creamer did not detail all the steps of the count so that it is at least possible that at the time he mentions Tiley may not have communicated to him the means of depositing the three separate series of phosphor lines and the after treatment of baking.

"In any event the testimony supported by exhibits corresponding to the notebook records of Partin, Todd and Payne and the progress reports of Bradley establish continuous work in the development and testing of complete color tubes and receiver circuits from August of 1950 to the demonstration of the transmission of a color picture in April of 1951."

In regard to the issue of reduction to practice, the Board devoted some 20 pages of its decision to a review of evidence adduced on the work performed by Philco, and stated:

"Here the record shows that the process of the count was used as the sole method of producing phosphor screens for cathode ray tubes from October of 1950 to at least many years subsequent to the April, 1951 demonstration. During the period between October of 1950 and April of 1951 and subsequent thereto the process was continuously repeated and duplicated. The use of the tubes produced may have been experimental, but the use of the process was not experimental but practical in the same way a new process for making test tubes would be practical even though each individual test tube produced thereby would be used only in an experiment. Thus the process as a manufacturing method was in continuous use from at least November, 1950 to April, 1951 and thereafter, as evidenced by the production of tube AE 12, for example. In view of the foregoing we find that there was a reduction to practice of the invention of the count in interference by April of 1951."

As to conversion by RCA of the joint application to a sole application, the Board observed:

"The testimony, which was adduced by a searching examination, fails to show that Rosenthal intended to deceive anyone with respect to inventorship, so the statute is satisfied. We may go further and say that the testimony fails to show that anyone had deceptive intent in filing the Rosenthal and Law application. The most that can be said is that the import of the testimony is that the matter of joinder was treated in a perfunctory manner."

THE PROCEEDINGS IN THIS COURT

The trial in this court commenced on February 8 and ended April 7, 1966, there being 31 trial days. Nine witnesses were heard; the deposition of Meier Sadowsky was received in evidence; and many hundreds of pages of documentary exhibits, and a number of photographs and other physical exhibits were introduced in evidence. A substantial portion of the evidence adduced in this court is "new" evidence.

Edward W. Herold, presently on the corporate staff of plaintiff RCA, was qualified by plaintiff as an expert and his examination continued through fourteen days. Dr. Herold was awarded a Bachelor of Science degree in physics at the University of Virginia, in 1930, a Master's degree in 1942 at Polytech Institute, Brooklyn, and was awarded an honorary degree of Doctor of Science at Polytech in 1961. During the period 1930 to 1959 he was employed at RCA and specialized in electronic tube development. From September, 1949, to mid-1950 he directed and coordinated RCA's color television tube work, and in 1951 edited a series of papers published by the Institute of Radio Engineers relating to this work. Dr. Herold was made director of electronics research laboratories at RCA research laboratories in Princeton, New Jersey, in 1957, and continued in that position until 1959 when he became vice president of Research Varian Associates in Palo Alto, California. He returned to RCA in 1965. He is a Fellow of the Institute of Electrical and Electronic Engineers, the author of articles on electronic tubes in the Encyclopedia Brittanica, a member of Phi Beta Kappa, the Sigma Psi, and for years has been listed in "American Men of Science" and "Who's Who in Engineering." He is a consultant to the United States Department of Defense, a member of its advisory group in electronic devices, and a member of the Board of Directors of the Institute of Radio Engineers. Dr. Herold holds more than 40 United States patents, some of which define vacuum tubes of the type used in radio and television circuits and on circuits of general utility and radio and television, including patents on electronic beam deflection devices. He is the author of more than 30 publications on technical subjects in the field of electronics, including one on the subject, "Methods Suitable for Television Color Kinescope," published in the Proceedings in the "Institute of Radio Engineers," under date October, 1951.

The greater part of Dr. Herold's extensive testimony relates to the daily Philco Color Tube Data Sheets covering the period August, 1950, through July, 1951. Dr. Herold exhibited profound knowledge in the field of color television development and this court was impressed with his apparent objectivity and honesty.

Austin E. Hardy, an expert in the field of phosphor chemistry, was subject to examination for some six days. Mr. Hardy in 1943 received a Bachelor of Science degree in chemistry at the University of New Hampshire, and during the period 1948 to 1952 engaged in graduate work in physics at Franklin and Marshall College. He joined RCA as a phosphor chemist in 1943 and is presently an engineer leader in the chemical and physical laboratory at RCA where for more than ten years his work was related in one way or another to phosphors. In 1945 Hardy was awarded the Electrochemical Society's Young Author's Prize for a paper entitled, "Photoconductivity of Zinc Cadmium Sulfide as Measured with Cathode Rays Oscilloscopes," and in 1947 was awarded the Turner Book Prize for a paper entitled, "Combination Spectro-Tradeometer and Phosphorometer for Luminescent Materials." For some five years Hardy served as chairman of the Subcommittee on Phosphors and Optical Screen Characteristics of the Joint Electronic Devices Engineering Council, a nationwide organization of electronic engineers. He is the author of approximately ten technical papers in the field of colorimetry.

The major portion of Hardy's testimony consisted of a detailed analysis of the daily entries contained in the notebook kept at Philco by D. Payne wherein Payne recorded the methods used and the results obtained at the Philco laboratory in its work on photodeposition of phosphor screens during the period August, 1950, through 1951. Austin Hardy displayed depth of knowledge of phosphor chemistry and this court was impressed by his objectivity and truthfulness.

Jesse Hilton Haines was called by plaintiff to identify certain color slides that he had developed while serving as a

member of committees of the National Television Standards Committee in the late 1940's and early 1950's. In order that a series of slides as nearly identical as possible might be distributed among firms engaged in experimental color television work, Mr. Haines in 1950 took pictures of a multicolored table setting. Haines' slides were used in their laboratories by both plaintiff and defendant and several exhibits relating to these slides were marked in evidence.

Robert M. Bowie was called to the stand by defendant Philco as an expert in the field of electronics. Dr. Bowie was awarded a degree of Bachelor in Chemical Technology at Iowa State College in 1929 and subsequently a Master of Science and a Ph.D. degree in physics at the same institute. He joined the predecessor of the Sylvania Corporation in the fall of 1933 where he commenced work on electronics, specializing in power tubes and patent matters relating to them. In 1934, he was placed in charge of the company laboratory, supervising research on cathode-ray tubes until World War II broke out, and then concentrated in the field of radar and microwave. In 1949 he became engineer of the physics laboratory, and in 1951 was transferred to the New York headquarters of the Sylvania Corporation as director of engineering. In 1958 he became vice president and general engineer of the research laboratories, and when Sylvania merged with General Telephone to form General Telephone Electronic Corporation, he continued as vice president and general manager of the research laboratory until he retired in 1964. During retirement he has acted as a consultant in electronic matters. Dr. Bowie is a Fellow of the Institute of Electrical and Electronic Engineers and the American Physical Society. He has served on the board of the United Engineer Trustees, a professional society which owns and operates United Engineers Center located at the United Nations plant; and is a member of several honorary societies and has acquired some 22 United States patents, a number of which have to do with cath-

ode-ray tubes, television and electronic circuits. Dr. Bowie has written some 35 to 40 technical papers, many concerning cathode-ray tubes. He was company representative on the National Television Systems Committee, which concerned itself with the color television standards eventually adopted by the Federal Communications Commission.

Dr. Bowie impressed this court as a highly competent electronics engineer and throughout the seven days of his examination demonstrated his sincerity and honesty. However, he did not display the specialized knowledge shown by Dr. Herold and Mr. Hardy as he had not had the extensive experience they had had in the development of screens for use in color television tubes. Moreover, Dr. Bowie had devoted but seven days before trial to preparation of his testimony. Both Dr. Herold and Mr. Hardy had spent far more time in exhaustive examination and analyses of pertinent records obtained from the Philco files. Further, defendant Philco attempted to use Dr. Bowie as an expert in some fields in which he lacked qualification.

William Earl Bradley was the second witness called by defendant Philco. He attended the Moore School of Electrical Engineering and the University of Pennsylvania where he was graduated with a degree of Bachelor of Science in electrical engineering in 1937. Mr. Bradley is a Fellow in the Institute of Electrical Engineers, a member of the American Physical Society, the Franklin Institute, and the Operation and Research Society of America. He first commenced work in June, 1936, for the Philco Corporation and a year later entered the television research department, and in 1946 became director of research of the Philco Corporation, continuing in that capacity until 1957 when he joined a team of scientists and engineers in Washington in a study of the intercontinental ballistic missile developments. In July of 1959 he became associated with the Institute for Defense Analyses in Washington and presently holds the position of Assistant Vice President. Mr. Bradley is a consultant of the

President's Scientific Advisory Committee, has written a number of technical papers, and has obtained some 80 patents in his name. Bradley served as head of the Philco research laboratory prior to, during, and subsequent to the critical period 1949–1951. He had testified in the interference proceeding, and was examined in this court as to his recollection of the activities of various persons and of particular events at Philco during the period 1949–1952.

Bradley volunteered his opinions and conclusions as to factual matters again and again despite the repeated admonitions of this court, and throughout his testimony clearly displayed an intent to color his testimony to support the contentions of his former employer, defendant Philco. During the course of Bradley's examination, this court concluded that much of his testimony was unworthy of belief. Subsequent review of his testimony and comparison of it with other pertinent testimony and exhibits has served to strengthen this court's conclusion that Bradley's testimony is entitled to little weight.

Richard S. Gudis, presently employed by the American Electronics Laboratory as an electrical engineer, also appeared for defendant Philco. He had been employed by Philco during the period from December of 1943 to January of 1955. Gudis received a degree of Bachelor of Science from the Drexel Institute of Technology in 1951 and thereafter worked on color television circuits under the supervision of Edward Creamer. In the spring of 1951, using Ansco color film, he took pictures of a Philco color television transmission of one of the colorful slides Haines had produced in 1950.

Robert Stork was called as a rebuttal witness by plaintiff RCA in connection with a demonstration, given the last week of trial, of a color television tube containing a photodeposition screen in which gelatin was used as the photosensitive binder. Some three weeks earlier, Mr.

Stork had accomplished the actual application of the screen used in the demonstration in this court.

Walter D. Baldsiefen was called by Philco on surrebuttal. He was graduated at New York University in 1918 with a degree of Bachelor of Science in chemistry and thereafter worked on light-sensitive systems for the duPont company. Baldsiefen's testimony centered about the use of gelatin as a vehicle for light-sensitive ingredients.

Theodore A. Saulnier, Jr., the last witness to take the stand, was called by RCA to identify the container of gelatin used as a photosensitive binder by Robert Stork in making the tube used in the demonstration viewed by the court.

## I. LAW'S ALLEGED CONCEPTION AND CONSTRUCTIVE REDUCTION TO PRACTICE

Harold B. Law, who received a B.S. degree at Kent State University and M.S. and Ph.D. degrees at Ohio State University, is a Fellow in the Institute of Radio Engineers and a member of the American Physical Society and Sigma Psi, and in 1955 was awarded the Vladimer Zworykin Prize in television.

Dr. Law joined RCA in 1941, and while assigned to research on pickup tubes exhibited an active interest in advancing proposals concerning methods of making television and color television picture tubes. In July, 1947, he performed work relating to phosphor television screens containing elements of phosphors of different colors, and he recorded details of work performed on the formation of a system of color filter strips for a television phosphor screen. In this effort he used samples of rose red luster, opal green luster, and dark blue luster stains, all commercially obtainable solutions designed to form color layers on the surface of glass, as well as photoengraver's glue which he exposed to light which was high in ultraviolet components.

On November 11, 1948, Dr. Law entered in his laboratory notebook a pro-

posal for a color kinescope in which the phosphor screen was made in such a way that a feedback light signal could be obtained for purposes of controlling the position of the electron beam. Application for a patent covering this proposal was filed July 30, 1950, and the patent issued on March 31, 1953.

On November 15, 1948, the alleged date of conception of the subject invention in suit, Dr. Law made notebook entries under the heading, "Settling Phosphors for Color Kinescope," and affixed his signature thereto; and on February 7, 1949, an associate, Stan Forgue, signed as having witnessed and understood the entries.

These two pages of longhand notes, the basis of plaintiff's conception claim (Law Exhibit 57) read as follows:

[First Page]

"Settling phosphors for color kinescope.

"A trial was made to settle willemite with silicate binder in it through a 100 line grill of flat electro-plated ribbons tied together every .1 inch by a fine wire. This is the grill that was made up for Schroeder's tube.

"The screen dried over the week-end and therefore stuck to the glass too tightly. Evidence was shown for a good sharp phosphor line. The experiment will be tried again.

"It would be highly advantageous if the phosphor strips could be applied by a photographic process since it would be easy to get a good mask by ruling and etching glass and filling the grooves with opaque material. Such a process would accommodate itself to a curved face plate.

"It may be possible to do the job by settling the phosphor in a photosensitive solution of gelatin, potassium dichromate

(Stamp)

WITNESSED AND UNDERSTOOD /s/ H. B. LAW

 FEB 7, 1949 Nov. 15, 1948

BY /s/ Stan Forgue

[Second Page]

and silicate binder. When the solution is poured it would be light sensitive. Exposure would harden the gelatin and trap the phosphor while the unexposed portion would rinse away. The silicate binder might have to be omitted.

"Subsequent firing in air would remove the gelatin and leave the phosphor. The second set of strips could then be applied.

(Stamp)

WITNESSED AND UNDERSTOOD /s/ H. B. LAW

 FEB 7, 1949 Nov. 15, 1948"

BY /s/ Stan Forgue

In explaining the work described in the first two paragraphs (Exhibit 57) Dr. Law testified:

"A. The word 'settle' means that a container or settling tank was obtained, into which was placed a glass plate, and then a liquid poured into the tank and a phosphor was then added to the liquid so that the phosphor would be distributed over the surface uniformly. Settling, then, refers to the action of the—that takes place—in which the phosphor particles fall through the liquid and settle on the bottom of the tank and on the glass plate.

"Q. Does this first sentence refer to some work that was done—and there I am referring to the first sentence below the title to this page 38?

"A. Yes, this work was done using a settling tank and a willemite phosphor to settle through a 100-line grill of flat electroplated ribbons, the grill being placed upon the glass plate.

"Q. Who did the work?

"A. This work was done by Mr. Meier Sadowsky."

Dr. Law stated that he had been working on the second floor of the east wing at RCA laboratories at the time, and he asked Mr. Sadowsky, who worked on the floor above, to settle this phosphor screen for him. Law also identified a page of a notebook Sadowsky used at RCA containing Sadowsky's description of the work done on that occasion for Dr. Law:

"Screen for H. Law, 11/12/48. 1 Mg/Cm $^2$ settled (with potassium silicate plus sodium sulfate) on glass plate on which mask of 100 mesh copper placed (lines per inch one directtion) set 11:45 a. m., poured 4:00 p. m. (tilt and siph). Dry over weekend.

"11/15/48. Mask (100-mesh copper) peeled off leaving lines on substrate. Some lines not complete—due to dried silicated screen coming off with mask. Otherwise pretty good. M. Sadowsky, 11/15/48."

It is the description set out in the third, fourth and fifth paragraphs of the November 15, 1948 notations (Law Exhibit 57) that plaintiff RCA contends defines the invention in issue.

Defendant Philco contends in its posttrial brief that Dr. Law's writeup of November 15, 1948, is not sufficient to establish conception; that further and different information was "needed in order to * * * enable a person of ordinary skill in the art to understand the invention and practice it"; and that subsequent experience of Dr. Law and his colleagues at RCA in attempting without success to find out how to carry out photodeposition of phosphors bears out defendant's contention.

During the trial in this court defendant repeatedly argued that, even though the document dated November 15, 1948 (Law Exhibit 57) set forth the steps of the method defined by the count here at issue, the 1948 document does not constitute conception because of two deficiencies: (1) that it contemplated the use of gelatin as the organic gel; and (2) that the sequence of steps covered by this description would include baking between application of successive patterns of phosphor (in addition to the baking at the end) and that this might, upon application and development of the next phosphor pattern, leave very little of the first phosphor pattern remaining.

(1) THE USE OF GELATIN.

Testimony of defendant's expert witness, Dr. Bowie, was adduced (on March 28, 1966) to establish that gelatin, the organic gel named by Dr. Law in his November 15, 1948, description, was not a proper material for use in photodeposition of phosphor:

"I don't believe that one would have success using gelatin for the deposition of phosphorescent screens by the process.

"* * * * * *

"Q. Well, Dr. Bowie, you earlier testified, did you not, to your opinion that gelatin would not be satisfactory material to attempt to use in photodeposition of phosphors?

"A. I so testified, yes.

"* * * * * *

"Q. Is it your belief that it would or would not succeed for that purpose?

"A. I doubt that it would."

It is interesting to note that in other previous testimony given by Dr. Bowie he had stated (on March 22, 1966) in connection with an explanation of front or back projection of light:

"Q. When you speak of gelatin coating, are you speaking of household gelatin primarily?

"A. I really meant to say gel coating, since that is used in the case here. It would be polyvinyl alcohol. It probably could be gelatin, any one of the materials that are rendered photosensitive and which would be mixed then with phosphor."

To rebut Bowie's expression of doubt as to the usefulness of gelatin (March 28, 1966), plaintiff produced a color television picture tube, the screen of which had been made by photodeposition with the use of gelatin as the organic gel. This tube, demonstrated to the court on March 31, 1966, operated successfully in a color television receiver in Trenton, displaying a color television program off the air from Channel 3 in Philadelphia.

The tube, a three-gun, shadow-mask, color television picture tube, was made, while the trial was proceeding in this court, by Robert Stork, an RCA technician, under the direction of Theodore A. Saulnier. In making the screen, which he did within a three-day period, Stork used the standard red, blue, and green phosphors, gelatin, water, and ammonium dichromate, but did not use any p. v. a., which is a synthetic, gel-forming material commonly used in screen manufacture.

This evidence seemed to demonstrate beyond question that gelatin could be used successfully as the organic gel in practicing the photodeposition method here in issue in making a color television picture tube.

On surrebuttal, defendant offered testimony that gelatin had been improved through the years, with Dr. Bowie testifying that in his early reference to gelatin as a deficient material, he had been speaking of the period of time from about 1948, "on up for a period of perhaps a year or two."

Defendant then called Walter D. Baldsiefen, who had for years worked with gelatins as vehicles for light-sensitive ingredients, to establish that gelatins have been greatly improved in recent years by the elimination of impurities. Baldsiefen had had no experience with testing gelatin for photodeposition of phosphors, nor did he express an opinion as to whether any of the improvements made in the quality of gelatins were needed in order to use gelatin successfully for photodeposition of phosphors. Apparently, defendant Philco intended his expert testimony to establish a basis for an inference that the type gelatin used in 1966 (Atlantic Gelatin, Pure Food Gelatin 100 Bloom (Law Exhibit 65)) to make the screen and tube used in the demonstration in this court was unavailable in 1948.

The significant testimony given by Baldsiefen is that prior to 1948 gelatins were available and widely used in processes where they were sensitized with bichromates:

"There are a number of hydrophilic colloids that can be used for that bichromate: gelatin, egg albumin, glue, fish glue, almost all protein substances generally, although there are some non-gelatin systems such as p. v. a. that also react with bichromates."

He also testified that 100 bloom gelatin, an inferior grade, was available in 1948.

In view of the contention of defendant Philco that gelatin was not a proper photosensitive binder and that even if it proved to be usable, it was unavailable during the period in question, the deposition testimony of Meier Sadowsky, a chemist who joined defendant Philco in February of 1949 after completing eight years of work on phosphor screens for plaintiff RCA, is most interesting:

"Q. At RCA what kind of material did you use?

"A. Gum arabic.

"Q. Why didn't you try gum arabic at Philco?

"A. Because I had gelatin handy and according to the literature, either one could be used.

"Q. There was literature about depositing phosphors on tubes with material?

"A. No, but there was literature about photolithography techniques.

\* \* \* \* \* \*

"Q. Are you saying that at Lansdale you did not have gum arabic available?

"A. I am saying I had gelatin available, and since either one, according to what the literature said, could be used, there was no point in my ordering gum arabic. I used what was handy.

\* \* \* \* \* \*

"Q. And it might have preceded your disclosure at RCA? (January 17, 1950.)

"A. Certainly preceding my disclosure at RCA I knew that gelatin could be used, because it is in old books and I had read most of the literature up to that time in the books."

Sadowsky also testified as to the source of his knowledge concerning the use of polyvinyl alcohol as an equivalent of gelatin or gum arabic:

"A. I don't remember at the time, but animal materials are some of the gel-forming materials. I only remember those two. Later on, during the time I was at Philco, I remember reading a report from duPont in which they mention that polyvinyl alcohol was used, and that is when I later on tried it, but I don't remember when that was. But I do remember reading, prior to my disclosure at RCA that both gelatin and gum arabic could be used.

"Q. Is polyvinyl alcohol a gelatin?

"A. No, it is a gel-forming material. It is a synthetic that has some of the same properties."

(2) THE SEQUENCE OF BAKING.

The last paragraph of Law's longhand description written on November 15, 1948, calls for subsequent firing in air to remove the gelatin and leave the phosphor, and thereafter it is stated, "The second set of strips could then be applied."

Literally interpreted, the description calls for a firing in air, or baking, of the first layer of phosphor mix applied before applying the second set of phosphor strips. Literal interpretation would call also for a similar firing, or baking, as the last step in applying the second set of phosphor lines, and, if a third color is used, a third baking as the final step in applying a third set of lines. It is defendant Philco's position that the firing, or baking, between successive applications of phosphors could not be successful, and hence, the alleged conception is in this respect deficient.

Defendant's expert Bowie states that he would not bake out the plate at the end of the first application of phosphors, for to do so would mean that upon application of the second phosphor the washing process would remove the material that had been put down on the first application as well as the unexposed photosensitive material applied on the second application. As a result there would remain on the plate at the end of the second process only the second phosphor in the places where it is desired, held down by the exposed gelatin. If the steps contained in the Law description are repeated a third time, the second phosphor would be removed at the time the third phosphor layer is baked, with the result that there would be well-defined areas of the third phosphor lying where they should be, but there would be only slight remnants of the second one, and probably very little of the first remaining.

In connection with the expert witness' testimony that the Law description called for three bakings, the following testimony was given:

"THE COURT: May I ask a question here? Let's assume, Doctor, tha⁺

what you have described happens here. We put on the second layer and bake it, and we have none of the first layer left or very little of it. Would anybody skilled in the trade have any difficulty rectifying that difficulty?

"THE WITNESS: I expect after having looked at the results and contemplating the process he would then try several things.

"THE COURT: I should think so. He would have an undesirable result right on his hands, wouldn't he?

"I suppose he would try to do something with respect to the retention of the first layer as well as the second. Is that correct?

"THE WITNESS: Yes, I think he would recognize that something needed to be done."

In rebuttal testimony, plaintiff expert, Dr. Herold, states that anyone skilled in the cathode-ray screen art in 1948 would have no difficulty in rectifying the problem cited by Dr. Bowie:

"In the first place, the use of organic binders to hold phosphors on screens was known and it was known that if these binders were baked in air they could be removed. It was also known that such organic binders should be removed before the screen was finally used in a cathode-ray tube.

"So one of the purposes, in fact the main purpose of the firing, which is referred to in the last paragraph of Dr. Law's Exhibit 57, he says, 'Subsequent firing in air would remove the gelatin,' one of the purposes was because if the gelatin were not removed and the screen were put in the tube, there would be some deleterious effects and this was understood.

"And the statement means that the gelatin could be fired in air just as these organic binders that were known would be fired in air before putting the screen in the tube.

"If the firing were to take place and then a second phosphor were to be applied and the first phosphor didn't stick as a result of it, or washed off, or something of this kind, then the person doing it would automatically say, 'Well, there is no point to firing three times, once after each phosphor, I only need to fire once before putting the tube together to get rid of it,' and I think it will be quite obvious he would skip the firing, the baking step between phosphor depositions and would therefore bake only at the end, just as he would normally have done if he had had only one phosphor applied, the bake would have been the last step.

"There is, however, a second possible solution if a person had a reason and wanted to bake between steps and this arose, if this occurred he would then use another expedient.

"There is another type of binder, your Honor, which was familiar in the cathode-ray tube art known as potassium silicate or kasil, as it has been referred to in this case before. This is an inorganic binder. It does not get removed by bake-out and one could then apply the silicate binder either after the first deposition of phosphor, either before the bake or after the bake in a very gentle way one could apply this binder and then subsequent treatment and subsequent deposition processes would be less apt to affect the first deposition.

"So there are these two things which were well-known, and I don't doubt that one could think of other things which might have been available in 1948 as solutions."

■■ It is well established that the date of conception is the date when the inventive idea is crystallized in all its essential attributes and becomes so clearly defined in the mind of the inventor as to be capable of being converted to reality and reduced to practice by the inventor or by one skilled in the art. 1 Walker, Patents § 45 (Deller 2d ed. 1964). As stated in Electro-Metallurgical Co. v. Krupp Nirosta Co., 122 F.2d 314, 318 (3d Cir. 1941), cert. denied, 314

U.S. 699, 62 S.Ct. 480, 86 L.Ed. 559 (1942):

> "The conception is the mental part of the process in arriving at invention and conception is evidentially established when it is demonstrated that sufficient reasoning has taken place so that the inventor fully understands and can describe the invention whereby it may be explained to others in the art. * * * "

Plaintiff RCA asserts that Dr. Law's description (Exhibit 57) dated November 15, 1948, clearly and conclusively establishes conception of the process of photo-deposition of phosphors. RCA stands on the writing alone and contends that, while Dr. Law during the early months of 1950 obtained good results in testing the principle of photodeposition, the subsequent events are not relevant to the issue of conception presented here,—but rather bear on the issue of reduction to practice.

Defendant Philco contends that Dr. Law's written description of November 15, 1948, was a *proposal*—not a *conception*—and asserts:

> "Plaintiff demonstrated in its brief before the Board of Patent Interferences that each clause of the interference count is applicable to Law's write-up of November 15, 1948. Defendant does not deny this. But under the law, this does not suffice to establish *conception*. Law has failed to prove conception by 1948 or any other date prior to the RCA application filing date, because contrary to what plaintiff states on pages 21 and 22 of its main brief, further and different information *was* 'needed in order to * * * enable a person of ordinary skill in the art to understand the invention and practice it.' As will be shown later in this section, the experience of Law himself and his colleagues at RCA in attempting without success to find out how to carry out photodeposition of phosphors bears this out."

In Applegate v. Scherer, 332 F.2d 571, 51 C.C.P.A. 1416, 1964, the court affirmed the decision of the Patent Board in favor of the junior party Scherer whose representative had by letter informed the senior party that it believed the chemical compound described in the count in issue might be more effective for the work the senior party was attempting to carry out, and delivered a sample of this compound to the senior party, who tested the sample and found it to be effective. In affirming the Board's conclusion that the junior party's representative's letter amply met the test of conception, the court stated at 573:

> "Appellants seem to propose that there cannot *be* a conception of an invention of the type here involved in the absence of knowledge that the invention will *work*. Such knowledge, necessarily, can rest only on an actual reduction to practice. To adopt this proposition would mean, as a practical matter, that one could never communicate an invention thought up by him to another who is to try it out, for, when the tester succeeds, the one who does no more than exercise ordinary skill would be rewarded and the innovator would not be. Such cannot be the law. A contrary intent is implicit in the statutes and in a multitude of precedents.
>
> "Thinking of the matter in this light and asking *who* made the invention, clearly it was Scherer who had the thought and not Applegate who merely made the test."

Defendant relies on the holding in Bac v. Loomis, 252 F.2d 571, 45 C.C.P.A. 807, 1958, wherein the United States Court of Customs and Patent Appeals reversed a judgment granting priority to the junior party. There, the subject matter at issue was a system for determining the position of a craft by means of impulses emitted by radio transmitters, and involved the use of at least two pairs of such transmitters. The transmitters of each pair were synchronized in such a manner that they emitted impulses at the same frequency, but with the impulses of one station lagging, by a pre-determined interval, behind those

of the other (a master-slave relationship). By obtaining readings on sets of impulses from two pairs of stations, the navigator was enabled to locate his position as lying on each of two hyperbolas and hence to fix his position at their intersection. The court found that Loomis's earlier conception had to do with synchronization of the transmitting stations by means of a "monitor station" which he described as being a third station so located that it could receive the impulses from both transmitting stations. When the impulses were not properly synchronized, the operator at the monitor station was to advise one of the transmitter operators by telephone so that appropriate corrections could be made. The court held that testimony given on behalf of Loomis was insufficient to establish that the concept of operating one station as a slave station formed a part of his idea; that the first attempts to put the Loomis idea into practice involved the use of a separate monitor station; that the slave station concept appears to have been introduced much later; that ultimate success was attained only after the incorporation of ideas which were not part of Loomis's original disclosure and apparently were not suggested by him; and that the date when complete conception was achieved was subsequent to the senior party's filing.

In *Bac*, events subsequent to the alleged date of conception were examined for the purpose of determining what elements were included in the description as of the date of alleged conception and what elements were subsequently added. We are not faced with that problem here, for the writing of November 15, 1948, is the only evidence of conception relied upon.

Defendant also relies on Raiche v. Foley, 113 F.2d 497, 27 C.C.P.A. 1380, 1940, wherein the court reversed the action of the Board of Appeals granting priority to the junior party, a surgeon who, seeking to create an integral one-piece distensible bag catheter, informed a rubber goods manufacturer that he had used tinfoil and shellac in the formation of the distensible portion in the wall of the catheter to prevent surface adhesion. The court found that the surgeon, junior party, was fully aware at the time he wrote to the manufacturer that his suggestion for separating the materials was unsuitable. It was further found that it was the manufacturer's chemist who independently discovered that a solution of ethyl cellulose in alcohol would be a suitable separating material. The court held the surgeon could not be credited with complete conception since one of the vital elements of the method defined in the counts was independently discovered by the manufacturer's chemist.

In *Bac* and *Raiche*, the junior parties were denied priority because their alleged conceptions were deficient in that each lacked a vital element of the method defined. We find that the case at bar is distinguishable on its facts, since we are thoroughly convinced that the Law conception of November 15, 1948, was not lacking in any vital element.

■ As to defendant's contention that gelatin was not a suitable material, we find that the evidence adequately demonstrates that gelatin is a suitable photosensitive binder for effective use in the method defined. It is established that gelatin is one of a number of hydrophilic colloids that are used in processes where they are sensitized with bichromates, and that polyvinyl alcohol (p. v. a), a non-gelatin substance, reacts similarly with bichromates, and, therefore, any one of these equivalent materials may be effectively used in the method defined.

Indeed, this point seems to have been practically conceded in the September 21, 1951, Tiley application under consideration here, where it is stated:

"The synthetic organic gels, including those above specifically described, are preferred for the process of the invention because of their uniformity and purity. However, natural organic gels free of contaminating impurities may also be used. The animal gelatins, animal glues, egg albumin, and the

various natural gums, such as gum acacia, which are rendered water insoluble when exposed to light in the presence of a dichromate or other photosensitive catalyzing reagent, are also suitable for the purposes of the invention."

■ As to defendant's claim that Law's conception is inadequate because of the sequence of baking described, we find from the proofs that one skilled in the trade would know that baking should be accomplished after all phosphor applications have been effected, and that baking between phosphor mix applications would only serve to disturb applications that had been subjected to prior bakings. Thus, one skilled in the trade in practicing the method described by Dr. Law would understand that baking is to be accomplished as the last step before the screen is placed into the tube so that the deleterious effects of gelatin would then be eliminated.

■ The filing of the RCA patent application on July 30, 1951, constituted a reduction to practice of the invention as of that date. See 1 Walker, Patents, § 47 (Deller 2d ed. 1964) and cases cited therein.

## II. DERIVATION OF INVENTION

It is plaintiff RCA's contention that defendant Philco should not prevail in this proceeding since Tiley derived his invention from Law through Sadowsky.

*Burden of Proof*

■ In an interference, the party asserting that the opponent derived the invention from him has the burden of proving it. Hagar v. Haines, 243 F.2d 176 (44 C.C.P.A. 885, 1957). Thus, the burden is here imposed on the party Law to establish that Sadowsky through his work with Law at RCA acquired knowledge concerning Law's invention which Sadowsky later imparted to Tiley at Philco.

Defendant Philco argues that the instant case is one like Rider v. Griffith, 154 F.2d 193 (33 C.C.P.A. 884, 1946) wherein the court, having considered all the related circumstances shown in the

record, concluded the burden of proof had not been met. Rider had alleged that the junior party, Griffith, derived the invention from him. The allegation was based on the fact that Rider for many years had been employed by the Automatic Sprinkler Company and had worked under Messrs. Lowe and Van Houton. Lowe and Van Houton then left Automatic and with Griffith formed a new corporation. The new corporation produced a device embodying the invention in issue and Griffith acted as its manufacturing agent. Rider claimed that Lowe and Van Houton were aware of his invention and had disclosed it to Griffith. The court found, however, that the evidence did not support Rider's contention.

Plaintiff RCA contends that the instant case is one like Beall v. Shuman, 1906 Dec.Com.Pat. 16, aff'd, 27 App.D.C. 324 (1906), wherein it was held the junior party had established his claim of derivation of invention and was entitled to an award of priority of invention. There, Beall, the junior party, was a civil engineer and an employee of Cranford Paving Company. John Stewart was a clerk in the employ of said company whose relations with the officers of the company were intimate and confidential. The senior party, Frank Shuman, a brother-in-law of Stewart, had no practical knowledge in the field of the invention in issue prior to his claimed date of conception.

The proofs showed that Beall conceived the invention in issue and made sketches illustrating the various devices of it and explained the invention to two contractors, one of whom, Brenizer, had his office in the same building as the Cranford Company where Beall and Stewart were employed. Both Brenizer and a clerk employed by his company corroborated the statement of Beall that Stewart came to them, examined the drawing left by Beall, had it explained, and suggested he would get his brother-in-law, Shuman, who made a business of developing patents, to take hold and work the thing out.

The Commissioner of Patents held that the senior party Shuman, derived the invention from the junior party, Beall, through a third party, Stewart, and on this ground awarded priority to Beall, stating:

"The mere appearance of two parties with the same invention identical in many novel and distinct details raises some suspicion of derivation by one from the other, and where one of these parties is proved to have been in possession of the invention prior to any date of possession proved by the other party and it is shown that opportunity for derivation by the later party from the earlier party occurred prior to such proved date of possession by the later party the suspicion of derivation in the absence of satisfactory evidence to the contrary becomes conviction, and it must be held that the later party did, in fact, obtain the invention from the earlier party. Shuman lays much stress upon the absence of direct evidence of his derivation from Beall; but the indirect evidence found in Beall's earlier conception and disclosure to Stewart and in the close association between Stewart and Shuman at the time that Shuman claims to have conceived the invention supports the inference that the invention was, in fact, derived by Shuman from Beall, and this inference is only to be defeated by proof that the invention was not so derived by Shuman. Such proof for Shuman is wanting."

The above cited cases, however, are of only limited importance in resolving the derivation issue since each case turns on its own facts. Thus, in the case at bar it will be necessary to review and weigh all the "new" and "old" evidence introduced by way of testimony and by exhibit to reach a conclusion as to whether the senior party RCA has sustained its burden of proof—thoroughly convincing this court that Tiley derived his invention from Law through Sadowsky.

Before turning to a resolution of that factual question, we must first determine whether the derivation issue is properly before this court.

### The Derivation Issue in the Proceedings Below

It is defendant's position that the issue of derivation of the invention in suit by Tiley from Law through Sadowsky was not asserted by Law in the Patent Office proceedings and hence may not be raised in this court. Cf. Gilbert v. Marzall, 87 U.S.App.D.C. 1, 182 F.2d 389, 391 (1950).

The brief submitted on behalf of Law at the final hearing before the Board of Patent Interferences contains a subsection pertaining to Sadowsky's knowledge in January, 1949, of Law's November 15, 1948, invention. Therein, plaintiff RCA argues that Sadowsky's knowledge of Law's invention is established by Epstein's testimony to the effect that he and Sadowsky discussed Law's proposed method of photodeposition of phosphors as well as Sadowsky's version of the method; that on January 18, 1949, Epstein witnessed Sadowsky's patent disclosure which was so similar to Law's that Sadowsky was uncertain as to whether to file the patent disclosure (the decision as to whether to file the disclosure was left to the RCA patent department); and that prior to bringing the patent disclosure to Epstein to witness, Sadowsky had shown Epstein a glass plate with some phosphor lines on it which Sadowsky stated had been deposited by the photographic method.

The brief also contains reference to the testimony of F. H. Nicoll, another RCA engineer, who identified a page of Sadowsky's notes which he, Nicoll, witnessed and signed on January 17, 1949. The notes include not only a description of the photographic process for depositing phosphor screens, but also a drawing illustrating this process. Nicoll also testified that Sadowsky's description was similar to Law's differing only in the use of gum arabic.

The brief submitted on behalf of Law then concluded:

"The record leaves no room for doubt that Sadowsky had obtained

knowledge of Law's invention of the photographic process for depositing phosphors before Sadowsky left RCA's employ at the end of January 1949 and entered the employ of Philco on February 1, 1949."

In a later section of that brief under the heading, "VI. Philco and Sadowsky," it is asserted that on February 1, 1949, Philco hired Sadowsky and put him in charge of forming the phosphor screens for Philco's color kinescopes; that Sadowsky had worked for RCA and learned of Law's invention; that in January, 1949, Sadowsky, before leaving RCA, had prepared a patent disclosure on a gum arabic version of Law's invention; that at least as early as May 8, 1950, Sadowsky told the Philco patent department of the Law photographic process, as evidenced by a Philco memorandum dated May 8, 1950 (Law Exhibit 43); that the Philco patent department's file of the Tiley application included a copy, dated May 29, 1950, (Law Exhibit 21) of the very same patent disclosure which Sadowsky had previously turned in to RCA (Law Exhibit 35); and that Tiley admitted that in the early part of 1950, and throughout 1950, he and Sadowsky interchanged technical knowledge.

After reviewing some of the Philco documents and pointing out that Tiley's name was not mentioned in connection with the method in issue until early June, 1950, RCA states:

"It is against that background that activities of the parties Tiley and Law are to be evaluated to determine whether Tiley has sustained his burden, as the junior party, of proving priority of invention, by a preponderance of the evidence."

The Tiley reply brief contains a sec-, tion entitled, "The Innuendo of Derivation by Tiley From Law Through Meier Sadowsky," in which the section of the Law brief headed, "VI. Philco and Sadowsky" is characterized as an attempt "to suggest a suspicion of derivation and thereby seek sympathetic treatment as to those other matters which properly are in issue." Therein, it is argued that

Law was unsuccessful in establishing derivation by Tiley from Law through Sadowsky even though Philco had produced all documents written by Sadowsky while in Philco's employ and eight named witnesses had been deposed on the issue.

The final paragraph of that section reads:

"Thus, no basis has been established for charging or attempting to impute derivation by Tiley. It is respectfully submitted that this does not constitute a meaningful 'background' against which 'the activities of the parties Tiley and Law are to be evaluated to determine whether Tiley has sustained his burden, as the junior party, of proving priority of invention, by a preponderance of the evidence', as proposed in the final paragraph on this subject on page 36 of the Law brief."

In its decision the Board of Patent Interferences devotes but eight lines to the significance of the fact that Sadowsky had been employed by both RCA and Philco:

"On pages 34 to 36 of his brief Law has a section identified by 'VI' and entitled 'Philco and Sadowsky.' While this section of the brief sets forth certain facts dealing with the relationship of Sadowsky (who was not called as a witness) with both RCA and Philco, no conclusions are drawn therefrom by the party Law. Similarly, we draw no conclusions nor find it necessary to make any further comment thereon."

Clearly a factual basis for and argument pertaining to the derivation issue were presented in the interference proceeding. Therefore, even though the Board in its decision failed directly to resolve the issue of derivation, we find that the matter is properly before this court for resolution.

### Sadowsky in Employ of RCA

Meier Sadowsky, who was employed by plaintiff RCA from October, 1940, to the end of January, 1949, and by defend-

ant Philco Corporation from February 1, 1949, to January, 1958, received the B.S. and the M.S. degrees in chemistry from the College of the City of New York in 1936 and 1937. During eight years of employment at RCA his assignments related generally to work with phosphors, the chemical aspects of forming phosphor screens for use in picture and other cathode-ray tubes. Sadowsky while at RCA became somewhat of an expert on methods of screen application involving lacquering and aluminizing as well as the deposition of phosphors. In 1948 he wrote an important paper on the subject, which was published in the spring of 1949. In this paper, entitled "The Preparation of Luminescent Screens" and printed in the Journal of the Electrochemical Society, the Sadowsky evaluation of the various methods used in screen preparation was made on the basis of the relative importance of such factors as luminescence efficiency, uniformity, thickness, coverage, texture, color, contrast, secondary emission, current saturation, and facility of deposition.

While at RCA Sadowsky applied for the following patents, which he then assigned to RCA:

United States Patent 2,412,654, "Luminescent Screen and Method of Manufacture"; Application dated February 27, 1942; Patented December 17, 1946.

United States Patent 2,625,493, "Method of Manufacturing a Reflective Fluorescent Screen"; Application dated April 17, 1947; Patented January 13, 1953.

United States Patent 2,644,770, "Method of Applying Films on Cathode-Ray Screens"; Application dated March 3, 1943; Patented July 7, 1953.

The last two and one-half years of Sadowsky's employment with RCA were spent at the plaintiff's laboratories in Princeton where he worked mainly on phosphor screen deposition for use in color television. During this period Harold Law was also stationed at the Princeton Laboratories.

As has already been explained, Sadowsky, at Law's request, settled a screen for work in connection with the Law notebook writeup of November 15, 1948. This settling work was inspected by Law and Sadowsky and is recorded in their respective notebooks.

A few weeks thereafter, on January 4, 1949, Sadowsky successfully tested the principle of photodeposition and recorded it, stating that when he developed the pattern in running water it left "a remarkably good pattern." This January 4, 1949, Sadowsky record is the first known recording of any test made of the principle of photodeposition of phosphor.

When asked to explain how he happened to do the work recorded in his notebook under date January 4, 1949, Sadowsky stated:

"As I remember it now, for the past two or three months or so previous to that we had been considering various approaches to putting down multicolored phosphors arrayed in discrete patterns separate from one another because of general interest at RCA in color television. While it is somewhat vague to me, I think that one of the people besides Dave Epstein who had asked me to do this work was Harold Law. He certainly was in and out of the lab a number of times.

\* \* \* \* \* \*

"Then, going to another stage, covering the predisposed phosphors again with paraffin exposed in the new area. This was somewhat laborious and it was delicate, but it did work after a fashion, as I remember.

\* \* \* \* \* \*

"And it occurred to me towards the end of December or roughly the first couple of days of January that this might possibly work for phosphor particles as well, so I tried it.

\* \* \* \* \* \*

"Well, basically—again I use the term 'largely photolithography'; I don't know whether I am technically

wrong in using that term, but this was the understanding in which I used it —photolithography consists of using some sort of gel layer, such as composed of gum arabic, gelatin or something of a similar nature, and dichromate as a hardener, which when exposed to light, especially ultraviolet light, would cause insolubility to form."

Testifying 13 years after the event, Harold Law could not on the basis of recollection state positively whether he did or did not discuss the invention of photodeposition of phosphor with Sadowsky, with whom he had worked in the latter part of 1948. However, David W. Epstein, who was Sadowsky's superior at that time, stated that Sadowsky had explained his test of January 4, 1949, to him and his proposed method for depositing phosphors on glass substrate using photo resist. Epstein at that time was already aware of Dr. Law's photodeposition proposal and inquired of Sadowsky as to how his proposal differed from that which Epstein had heard described as Dr. Law's. According to Epstein Sadowsky was familiar enough with the work of Dr. Law to be able to explain some of the differences.

One of the differences between the Sadowsky test of January 4, 1949—the subject of his patent disclosure of January 18—and the Law description of November 15, 1948, was that Sadowsky used gum arabic as the organic gel whereas Law's description called for gelatin. However, it was understood in the art of gum-bichromate printing that a number of photosensitive materials might be used, including gelatin and gum arabic.[1]

The similarity between Sadowsky's work and Law's was sufficiently close, however, that Sadowsky was not certain whether to file a patent disclosure with the Patent Office. Epstein suggested that Sadowsky submit a disclosure to the RCA patent department and let them determine if it should be filed. Epstein further testified that he had examined Sadowsky's laboratory setup which included a light source, a mask, and a plate; and he saw a glass plate with some phosphor lines which Sadowsky said were deposited by photodeposition. On January 18, 1949, Epstein witnessed a patent disclosure data sheet prepared by Sadowsky, covering his work of January 4, describing "The Deposition of luminescent screen by the aid of optical means and depositing the screen in the form of a particular pattern if desired."

Sadowsky in his deposition testified that in addition to Epstein the only person to whom he remembered showing the work he did on gum arabic and photodeposition was Dr. Nicoll, a fellow employee at RCA. Dr. Nicoll's awareness of Sadowsky's work is substantiated by the fact that the notes made by Sadowsky of his experiment of January 4 entitled "Gum Dichromate Printing Process for Screen Deposition," were witnessed by Dr. Nicoll on January 17, 1949.

▆ Thus, the proofs establish that shortly before terminating his eight-year period of employment with RCA, Sadowsky was familiar with Law's claimed conception of November 15, 1948, and had aided Law in that work by preparing a screen for him. In addition, on January 4, 1949, Sadowsky, himself had conducted what he considered a successful test of the principle of photodeposition of phosphors and had on January 18, 1949, submitted a patent disclosure covering that test to the RCA patent department.

---

1. The textbook Photographic Facts and Formulas by Wall and Jordan, published 1940, in describing photographic processes using a photosensitive bichromated and pigmented colloid (gel) states:
 "Any colloid substance such as white of egg, glue, gelatin, or mucilage may be used for this process but pure *gum arabic* is the favorite medium for most workers."

Also, a 1942 British patent No. 548,-953, in describing photographic processes, refers to use of bichromated photosensitive materials "such as *gelatine*, fish-glue, albumen, bitumen or *gum arabic*.

Also see Modern Photoengraving, by Flader and Mertle, copyright 1948, p. 162.

*Sadowsky in Employ of Philco*

In December of 1948 or early January of 1949, while still in the employ of plaintiff RCA, Sadowsky received a call from Joe Grabiec, an employee of defendant Philco, inquiring whether Sadowsky was interested in working for Philco's subsidiary, Lansdale Tube Company. Sadowsky was told that "they had just acquired the Robert Wise group from Long Island and they were going to set up some development laboratories at Lansdale." After negotiating with Philco, Sadowsky accepted the offer and gave RCA notice in January of 1949 that he would terminate his employment at the end of the month. On February 1, 1949, Sadowsky entered the employ of Philco's subsidiary, Lansdale Tube Company, at an increase in salary. Sadowsky's position was section engineer in charge of the chemical laboratory of the new development laboratory of Lansdale Tube Company, and by 1950 Sadowsky was made chief chemist.

It was Sadowsky's understanding that he was expected to report to defendant Philco's patent department all research work he had done at RCA. When asked who had given him such an impression, he replied:

"I cannot state that because I don't know that anybody asked me in so many words to do that. It was my understanding from various questions that were asked at various meetings about what was done elsewhere, that this was the general tenor of their interest and the general tenor of my participation in the reply. I had never, to my knowledge, been specifically asked by a member of the patent department of Philco to tell them in detail exactly what I had done at RCA in relation to a certain patent disclosure."

At Lansdale, Sadowsky initiated research and development work relating to forming phosphor screens for use in color television tubes. In late 1949 and in early 1950 Sadowsky considered various ways of depositing phosphor patterns for color television picture tubes, including silk screen, settling through a mesh, spraying, and photodeposition.

On September 6, 1949, Sadowsky, in a Philco memorandum addressed to R. M. Wise on the subject, "The Line Screen Color TV System," (Law Exhibit 20) after describing the "line screen" approach to color television reception and the means used to excite the phosphors, stated:

"The writer does not know how old the above approaches are. In 1944 or 1945 RCA did attempt to make a line screen in order to explore its possibilities. A mask was made to spray the phosphor suspension onto a flat substrate to be used for the screen end of the kinescope. However, the best that was achieved was a two-component screen with only fair registry and uneven thickness or depth of phosphor layers.

"While interest remained in the fabrication of a three-component screen, not much attention was given to it because it was felt the attendant difficulties ruled it out. However, in the fall of 1948 interest in the new system of color TV was given new impetus by laboratory management and at Dr. D. W. Epstein's suggestion the writer undertook the problem of making a usable line screen.

"It was decided to use the settling technique because of its control on screen thickness, uniformity and contrast. The original mask used for the sprayed screen was resurrected, and modified for use in a liquid settling process. Techniques were developed for fabrication of a 3 component screen. Before the writer left RCA in January 1949, two line screens were made, one of which was in the process of being incorporated into a tube. (The screen was aluminized.) Later reports received by the writer unofficially claim a successful demonstration of the tube before RCA management."

In this document, dated September 6, 1949, Sadowsky relates that in June,

1949, on a visit to RCA, he noticed several such screens being fabricated and he outlined the problems involved in the method. Under the heading "Status," Sadowsky states that sketches of the mask were submitted to Philco on August 20 and the mask was being fabricated, and that if "it works properly a screen will be made within a week of its arrival at Lansdale." After making alternate suggestions, Sadowsky states he would be happy to entertain and explore the possibility of any suggestions related to the above problem.

Sadowsky handed over to his associates at Philco a copy of a report which he prepared while at RCA (Law Exhibit 33) of a trip made to the Electrochemical Department of the duPont Company at Perth Amboy, New Jersey. The purpose of the trip was to determine the availability of suitable colors for application to glass and to observe methods of application. Sadowsky had distributed copies of this report while at RCA to his associates, Epstein, Nicoll, and Law.

On September 14, 1949, Sadowsky signed a Philco report (Law Exhibit 22A) of a trip made to the same duPont department at Perth Amboy for the purpose cf discussing glass colors and lusters, wherein he states that in the preceding year he had approached duPont on the problem of glass colors, and that the duPont Company was approached again in the hope that new and better materials and techniques might be available. Sadowsky sent copies of this trip report to nine of his associates at Philco, including Bradley, Grabiec, Smith, and Wise.

On January 19, 1950, Sadowsky made a written report (Law Exhibit 24A) to R. M. Wise of results of his visit to the Eastman Kodak plant to discuss filters for "line screens." The third paragraph of this report begins with the following sentence: "External to the bulb face they feel sure an emulsion can be directly applied and exposed to yield a 3-color line pattern."

Sadowsky and D. P. Smith, a Philco vice president, were the Philco representatives who attended the Washington demonstration of the RCA shadow-mask color picture tube given to the Federal Communications Commission and the industry on April 6, 1950. The RCA bulletin on the demonstration gave some details of the shadow-mask tube construction but did not disclose how RCA had made its screens. (These screens were made by the silk-screen printing technique.)

In early April of 1950 after seeing the RCA demonstration of its shadow-mask tube with a phosphor-dot type screen, Sadowsky and his associates at Philco speculated as to the processes used by RCA. Sadowsky then tested several techniques for applying phosphor dots, including photodeposition, the method he had tested some 15 months before, on January 4, 1949, while still employed by RCA. Sadowsky testified that early in April, 1950, "I put down a photodeposited screen. It wasn't very good."

Sadowsky, in a report covering the week April 13 to 19, 1950 (Law Exhibit 33) stated under the heading, "PHOSPHOR L–2063—Screen Investigation":

"A series of .0035 phosphor dots were applied by settling through an electro-mesh mask.

"Two glass plates were screened and aluminized for gold line deposition for color tests."

Further, in a progress report (Law Exhibits 14 and 17J), covering the week April 27 to May 3d, Sadowsky stated under the heading, "PHOSPHOR Screen Investigation":

"Several screens were prepared in a gelatin and dichromate medium for tests on photolithographic techniques."

This progress report made by Sadowsky is the first record at Philco of work done on photodeposition, nor is there in evidence any earlier Philco record relating to proposals for photodeposition.

When questioned on deposition as to the contents of the progress report for

the week April 27 to May 3, 1950, Sadowsky testified:

"In particular, I was attempting to deposit a pattern or discrete arrangement or pattern of phosphor on a glass substrate, using photographic exposure to fix the phosphor in place. I used the term 'photolithographic' in a general sense to denote that the area that was hardened was done by photographic means, possibly as a carryover from the time I used to be a printer, when we used lithography, and this was, to my knowledge, the generic term for a method of fixing a pigment in place by photographic exposure.

"Question: Does this 'photolithographic technique' have any other name which is commonly applied to it?

"Answer: I imagine you could call it photo deposition; you could call it photo fixation; you could call it photo hardening.

\*　\*　\*　\*　\*　\*

"The third item, where I say 'Several screens were prepared in a gelatin and dichromate medium for tests on photolithographic techniques,' was an attempt probably at that time to see whether we could deposit lines or dots or some other pattern—I seem to remember it was dots—by photolithography or photoengraving or photo deposition, or whatever you care to call it."

When cross examined as to who made the screens referred to in the report (Law Exhibits 14 and 17J) covering the week April 27 to May 3, Sadowsky stated:

"Answer: I don't remember whether I made them or whether someone working for me made them at my direction. You see, the practice was for me to writ a weekly report on what was done in each of my groups, in the phosphor group, in the chemical analysis group and whatever other group we were working with. Each one of these chaps gave me either some brief notes, verbally or in writing, on what they did and then I combined them into my report for the week. This is a weekly report. At the time I believe Don Payne was working for me, and it might have been he who did it under my direction or it might have been that I went in the lab and did it. At that time this was normal that I was taking an active part physically in some of the work. [It should be noted that Payne did not join Philco until May 22, 1950.]

\*　\*　\*　\*　\*　\*

"Question: Did you specifically request that this be done?

"Answer: Yes.

\*　\*　\*　\*　\*　\*

"Answer: If this was in the field of these particular type of screens and if it was a person working for me, it was someone who was rather new at it and who would not in this field, as I remember, have been proficient enough to engage in this type of work on his own without my direction.

\*　\*　\*　\*　\*　\*

"Answer: Perhaps you don't understand what I meant by the term 'for test.' I was testing out the process, not putting it on there by this technique, to test it is some other way. These were tests on the technique and not tests for use in cathode ray tubes.

"Question: Were these tests actually prepared by photolithography?

\*　\*　\*　\*　\*　\*

"Answer: Yes, I said either I did it myself or I saw it done by somebody under my direction, but I don't remember. I remember what they looked like at the time but I just don't remember the details at this moment."

In preparing the several screens in a gelatin and dichromate medium for tests on photolithographic techniques during the week of April 27 to May 3 (Law Exhibits 14 and 17J), Sadowsky used an aperture (exposure) mask which he had obtained when he visited the Buckbee Mears Company in Milwaukee, Wisconsin.

On May 5, 1950, Arnold T. Wicklund of the Industrial Division of Buckbee

Mears Company located in St. Paul, Minnesota, addressed a letter to the Philco Corporation, Lansdale, Pennsylvania; Attention: Mr. Meyer [sic] Sadowsky; (Law Exhibit 53) Reference: Your Purchase Order No. OF-76234:

"Dear Mr. Sadowsky:

"I have done considerable work on the depositing of phosphors on glass by photographic methods.

"I am sending under separate cover the piece of glass on which I have laid a pattern of dots with green phosphors in a gelatin based solution. The gelatin formula is essentially gelatin, water and dichromate. The green phosphors were stirred into the solution, and as you will notice from the sample are not of sufficient concentration nor are they ground into the solution smoothly. However, this sample indicates to me if considerable development work is done a solution can be devised that will work adequately and a method of introducing the phosphors powders into the solution smoothly can also be developed. We have spent about $150.00 on this research project. We are not going to go further unless we hear from you. The balance of your $500.00 order will be taken up with the producing of the original aperture mask and the settling mask which you had on reference purchase order.

"Should you wish us to pursue a photographic deposition of phosphors we will have to discuss a development contract to cover this work, as we will have to start out from scratch on working toward formulas and techniques.

"We will await with interest your comments on this rather crude sample."

On May 8, 1950, in a telephone conversation with D. P. Earnshaw, Esquire, a member of the Philco patent department, Sadowsky told him of his January 18, 1949, RCA patent disclosure and about the photodeposition work which he had had Buckbee Mears do for him. Mr. Earnshaw, in turn, reported Sadowsky's call to W. E. Denk, Philco's Chief Patent Engineer, in the following memorandum (Law Exhibit 43):

"10:30 a. m. M. Sadowsky called from Lansdale. Indicated that he had sent in a disclosure to RCA when still employed by them relative to a method of making a color screen which used gum arabic and potassium dichromate, this screen being fixed by a photographic process. He does not know whether RCA ever applied for a patent on this disclosure. He is inclined to believe that they did not. In his recent work on color screens he has contacted Buckley-Meers [sic] of St. Paul, Minnesota relative to laying down a screen in this manner. This firm handles quite a bit of work in photo color engraving. They have produced some very interesting screens for him, but he still feels that the method is covered by his original disclosure to RCA."

The May 8, 1950, memorandum (Law Exhibit 43), Earnshaw to Denk, was found, with "May 22" stamped thereon, as the third paper in the Tiley patent application file in the Philco patent department when testimony was taken during the Patent Office proceeding. This memorandum had been routed by Denk to Allen V. Hazeltine, Esquire, Philco's division patent counsel in charge of electronics, as is evidenced by the initials "A.V.H." appearing in the upper left margin of the memorandum. Mr. Hazeltine was the Philco attorney of record for the Tiley patent application which was filed 17 months later, on September 26, 1951, he participated in the questioning of witnesses on deposition in the Patent Office proceeding, and he was present in this court throughout the trial of the instant suit. Mr. Hazeltine testified on deposition that he had no recollection of having seen Law Exhibit 43.

On May 8, 1950, Sadowsky signed a research laboratory record pertaining to color screens (Law Exhibit 19), particu-

larly to several silk screens. This record was witnessed by John W. Tiley on May 12, 1950.

Sadowsky, in a progress report covering the week May 4 to May 10 (Law Exhibit 15), under the heading, "Phosphors," stated, "Photolithographing (bichromate process) has also been tried, and is being continued." In this report he also states, "Silk screen experiments were continued." Several more samples were sent to Philco for Al [aluminum] and Au [gold] deposition. A large (9″ x 12″) screen has been started with help of Mr. J. Tiley." This portion of the progress report contains the first reference to Tiley made in any Philco document in evidence, and it pertains to Tiley work on silk screening.

On May 12, 1950, Tiley witnessed a Sadowsky patent disclosure (Law Exhibit 43(3)) bearing a conception date of May 9th. This invention disclosure is entitled, "Method of Making Luminous Screen Tube," and pertains to the use of a decalcomania principle to fabricate and apply a phosphor and aluminum screen.

On May 15, 1950, Sadowsky wrote another Philco report (Law Exhibit 43(1)) on "The Color Program," in which he states the company effort on color tubes is directed along three lines:

"1. A tube incorporating a screen having three colors (either phosphors or filters) in a pattern of lines (circa .020″ each), aluminized and having gold lines on top of the aluminum in registry with a space between each set of colors beneath (if filters used, this 'space' will be black). Here the difference between the secondary emission of the gold and the aluminum registers the beam with the appropriate color.

"2. A tube incorporating a grid of ribbons near the tube face. The sides of the ribbons are coated alternately with two phosphor colors while this phosphor color is on the tube face itself. Color discrimination is effected by the charge impressed on the ribbons, a particular phosphor being excited when a charge is on one or the other ribbon or no charge present (allow electrons to impinge on face of tube).

"3. The 'RCA' type tube. Here the three phosphors are arranged in dots in small triangle. A porous mask ¼″–½″ behind the screen with holes the same size as the phosphor dots and positioned directly behind the triangle center. The three beams ('red,' 'blue,' and 'green' modulated) traverse the hole in directions 120° apart so as to excite their own phosphors.

"The above are listed in order of importance to Philco at the present time, with the first receiving by far the most emphasis.

"The obvious advantage of the first system is the lack of 'hardware' in the tube with its consequent outlook for easier mass production. Other advantages are:

1. Apparently simpler circuitry with a resultant cheaper set.
2. Greater color efficiency.
3. It would be a 'Philco First.'
4. It can be used in an all glass bulb and if color filters be properly developed they could conceivable [sic] be applied by the bulb manufacturer, leaving *standard* processing for Philco.

"The disadvantages are that for finer definition, finer beam spot tubes must be developed and one-fourth of the screen does not luminesce (under the gold line)."

Sadowsky further states:

"Another approach is a photoengraving technique. Here the phosphor is the pigment and exposure to light 'fixes' it in line form. Some small samples have been made but much has yet to be done to determine whether this approach is feasible for three sets of phosphor lines.

\* \* \* \* \* \*

"Parts for the 'RCA' tube are on their way (as we conceive the design). When received we will attempt to fabricate a screen and incorporate it and the mask in a tube.

"It is far from inconceivable that either a new system entirely or new approaches to the above systems may be presented before the presently planned program is complete. If so, they will be considered according to their importance and the time elements involved."

■ A copy of the patent disclosure which Sadowsky had submitted to his employer in January, 1949, was found in the Philco Tiley patent application file as the second paper contained therein, bearing the stamped date May 29, 1950. This document which stated that on "January 4th, 1949, [I] conceived the idea of producing a luminescent pattern on a substrate by a photoengraving means," was RCA property. Sadowsky committed an ethical, if not a legal, wrong in giving this confidential material to Philco, as did Philco in accepting the disclosure and making it available to Philco personnel in the Philco Tiley patent application file. See Colgate-Palmolive Company v. Carter Products, 230 F.2d 855 (4th Cir. 1956), cert. denied, 352 U. S. 843, 77 S.Ct. 43, 1 L.Ed.2d 59 (1956). Note, Injunctions to Protect Trade Secrets—Goodrich and duPont Cases, 51 Va.L.Rev. 917 (1965).

A report prepared in early June, listing the status of projects and results obtained during the month of May, 1950 (Law Exhibit 39), signed by W. H. Bradley, Director of Research, is the first document in which Tiley's name is mentioned in connection with photodeposition of phosphors. It is therein stated:

"One of the most striking developments of this period has been the discovery by Tiley, Sadowsky, and Bocciarelli that the phosphors may be deposited by an optical process employing hardening of polymeric materials by potassium dichromate. This process,

since it is governed by photographic techniques, is capable of extreme accuracy and uniformity as has been clearly demonstrated on the small test plates. (It also provides the best known method for depositing the phosphor dots for the RCA type tube.)"

In the progress report prepared by Sadowsky for the week of June 1 to 7, 1950, Tiley was referred to only in connection with silk-screening work.

On August 2, 1950, Sadowsky reported again (Law Exhibit 35) on the Philco Color Program, giving a brief outline of the status of and plans for color tubes, together with some comment on the reasons for the tests, including the following:

"*Objective*

7. Determine relative merits of silk screen vs. a photolithographed screen.

*Status*

A small line screen (2–¾" x 3–½") prepared by Mr. J. Tiley by a "Photolith." process is being processed into a tube for life test.

Another such screen will be incorporated with one prepared by silk screening for direct comparison of delineation, light output and stability.

"*Objective*

8. Develop process of fabricating best *quality* screen so that dependable reproducibility is achieved, and a practical production procedure is in view.

*Status*

Work is continuing on simplication of the silk screen process. Reproducibility seems to be at hand. As soon as a representative screen is decided upon, much further simplification can be rapidly achieved.

"II. The Dot Screen (RCA System)

The copper aperture masks have been received and one has been mounted for screening. The screening process seems much more critical that the silk

screen method. It is hoped that a 3 color screen can be made this month."

In a document (Tiley Exhibit 25) bearing a stamped date September 5, 1950, and entitled "Photodeposition of Line or Dot Fluorescent Screens on Cathode Ray Tube Faces," John W. Tiley sets out certain line or dot screen requirements and states that, "These considerations were brought to the writer's attention in May, 1950, by Mr. Bocciarelli when the question of production, on a laboratory scale, of a color TV screen was discussed. Tiley states therein that at the time he suggested a concurrent investigation of silk-screen printing, which Sadowsky was already considering, and of photographic deposition by a wash-off process. Tiley describes the use of polyvinyl alcohol and states that, "Sufficient success has been achieved by this time, June 25, 1950, to warrant additional intensive work on the preparation of solutions of various types in the hope of achieving uniform results," and "also at about this time several flat plates, 2–¼" x 3–½", were sent to Lansdale for mounting in tubes in order to determine the vulnerability of the phosphor to the photographic processing solution." Tiley also states that experiments on air-settling a thin screen on the inside of a Peach tube (done through the ⅝" diameter neck) on top of a thin-flowing photosensitive film on the tube face has produced lines of excellent accuracy, and he proposes a setup for laboratory production of color tubes by the photographic method. Attached to this document are two diagrams of a work area for color tube pilot production, both of which show an arc light set up for a front projection method of photodeposition, using a one-piece bulb.

Thus, Sadowsky's report of August 2, 1950 (Law Exhibit 35) and Tiley's of September 5 (Tiley Exhibit 25) disclose that during the summer months they were working toward the objective of determining the relative merits of the silk-screen method and the photodeposition method of making phosphor screens. This decision had to be made so that Philco could concentrate its efforts on attempts finally to reduce to practice the method which gave the greater promise of dependable reproducibility and hence practical production.

On May 16, 1951, John W. Tiley signed an invention disclosure entitled, "Photographic Screen Deposition Method," with the stated purpose, "to provide a method for depositing phosphor in pattern or line form without taking apart cathode-ray or other tube." In this disclosure, Tiley states the date of conception was March 15, 1950, 14 months prior to the date of signature. Therein, Tiley claims that the advance over the prior art is that it "increases by a large factor the quality of line or dot phosphor structures and permits placing the mask outside the tube." He discusses the undesirability of having the face plate illuminated from the rear (back projection). Further, he states the invention was built on April 1, 1950, tested on the same date, and "Recorded in Notebook No. S. Onigian, M. Sadowsky, D. Payne." [The evidence discloses that P. Donald Payne, Jr., a chemist, commenced his employment with Philco on May 22, 1950, and joined Tiley in the Philadelphia laboratory on August 30, 1950, and that Onigian joined Tiley and Payne subsequent to August.]

On September 14, 1951, Meier Sadowsky filed an application for patent (No. 2,729,583) which he assigned to Philco, relating to improvements in the manufacture of cathode-ray tubes adapted for color television reception and, more particularly, to methods of fabricating aluminized tube screens. In Column 3, line 39, of the application the following language appears:

"One of the aforementioned separate processes starts with the deposition of phosphor strips on the glass substrate 10 of Figure 1. This operation is symbolized by rectangle 16 of Figure 2. *It may be carried out in a variety of well known ways, as, for example, by settling, silk screening, or photographically depositing the various phosphor strips.* In practice, I prefer to use the latter method, which con-

sists of first applying a uniform coating of one of the fluorescent materials to the entire glass substrate, together with a photosensitive emulsion, then exposing portions of this fluorescent material through slits in an otherwise opaque mask, these slits having been cut at positions corresponding to the desired location of strips of that particular phosphor. This exposure fixes the phosphor of the exposed portions and the remainder of the unexposed phosphor can be simply washed off. This process is repeated successively with each of the other two phosphors, the mask being, of course, relocated each time so as to permit exposure of the proper portions of the phosphor which it is desired to have remain on the glass substrate. A variety of phosphors are known which lend themselves to this process of manufacture." [Emphasis supplied.]

Although in Sadowsky's patent application of September 14, 1951, it is stated that photodeposition of phosphors is well known, just twelve days later, on September 26, 1956, Philco filed a patent application in the name of John W. Tiley, broadly claiming a method of photodeposition of phosphors. This application related to the subject of Tiley's patent disclosure of May 16, 1951, but was broader in that it contained no limitation as to front or back projection, nor did it specify the use of a one-piece or of a separable glass bulb.

This chronological review of documents in evidence would seem to establish that Sadowsky, during the period September, 1949, to September, 1950, used his knowledge, his extensive experience, and proven abilities in the field of phosphor chemistry in an effort to develop and reduce to practice for Philco the best and most economical means for accomplishing the making of phosphor screens for color television tubes, and that all such efforts at Philco during the said period were made under Sadowsky's direction and supervision. The documents reviewed would further seem to establish that Sadowsky, in April and early May of 1950,

had informed a considerable number of his associates at Philco of his knowledge of the principle of photodeposition of phosphors acquired at RCA and as a result of his continued work at Philco.

These documents, on the other hand, seem in no wise to support the contention of Philco that Tiley, by the exercise of inventive genius, conceived the principle of photodeposition on March 15, 1950, or at any time thereafter. Rather, the documents seem to indicate that Tiley, commencing in June of 1950, under Sadowsky's leadership and direction, was assigned the task of attempting to reduce to practice the principle of photodeposition so that the group headed by Sadowsky could make a determination as to which of the methods under consideration held out greater promise for the production of multicolor television tubes—silk screening or photolithographic screening (Law Exhibit 35). Such a determination was made by Philco on October 16, 1950, at which time the silk-screening method was abandoned in favor of photodeposition of phosphors method.

*Philco's Claim of Originality*

Whereas RCA relies primarily on documents connected with Sadowsky's activities at both RCA and Philco as establishing derivation of invention, Philco stresses the testimony of Tiley, Payne and Bradley as establishing originality of invention.

(1) Tiley

John Wayne Tiley, an engineering specialist at the Lansdale Division, Philco Corporation has been employed by Philco since September, 1940. Mr. Tiley had no college training. On deposition in 1961 he testified that he is a senior member of the Institute of Radio Engineers, a member of the Electrochemical Society, and a member of the Franklin Institute. In January of 1950 he was assigned to assist Mr. Sadowsky, who had "embarked on a procedure wherein he was attempting to print line structures on a flat glass plate, using silk-screen techniques, for the purpose of producing color television picture." Although Tiley worked in the

research laboratory in Philadelphia and Sadowsky worked in Lansdale, Pennsylvania, they saw one another fairly frequently in the early part of 1950.

Tiley states there was a free exchange of technical ideas on the subject of silk screening, but he does not recall the first occasion when he talked with Sadowsky about the use of photographic methods for making a color television tube. And Tiley does have "a vague recollection of him [Sadowsky] referring to previous work after we had developed this process. And it's been so darn long that I forget exactly what I did refer to." Tiley further states that Sadowsky's contributions were primarily concerned with phosphor chemistry and that Sadowsky was far more cognizant of this field than Tiley was. When asked whether he had worked in chemistry prior to 1950, Tiley answered, "I had done work in the silk screen end of things. I had done some chemical work, not very much, I do a lot of things. In general I am not a specialist, but rather try to have as broad a knowledge as I can acquire and conveniently retain."

Mr. Tiley asserts he conceived the invention in issue on March 15, 1950. This is approximately two months after Tiley was first assigned to assist Sadowsky in the development of color television screens. Although asserting conception as of March 15, 1950, Tiley does not refer to any March 15, 1950, document to corroborate his assertion; nor does he claim to have made notes on the subject of photodeposition of phosphors at any time from the commencement of his association with Sadowsky in January of 1950 through June of that year. Thus, we have a complete lack of recording by claimant Tiley of any activities whatsoever, laboratory or otherwise, not only as of March 15, the alleged date of conception, but also for a period of three months prior and subsequent thereto.

In explaining his relationship with Sadowsky, Tiley testifies:

"Question [of Tiley]: Was Mr. Bocciarelli working on a matter of producing screens for color television picture tube at the time when you first began to work on it?

"Answer: No, Mr. Sadowsky at Lansdale was the only one who was working on this project. There were many ideas kicked around at that time. Mr. Bocciarelli may have contributed to other parts of this program. Just precisely what—it has been so long—I am afraid I can't be specific.

"Question: Did you have occasion to work closely with Mr. Sadowsky in the early part of 1950?

"Answer: Yes, sir. That is how the matter came to my attention. The difficulties he was having with silk-screen printing. I was one as having experience in silk-screen printing, to see if I couldn't help him, and this is how I became aware of the problem.

"Question: Did you consult with him either in this building or at Lansdale?

"Answer: Yes sir.

"Question: Both places?

"Answer: Yes sir. He visited the research department and I visited in Lansdale.

"Question: About how often did you say you saw him the early part of 1950?

"Answer: Perhaps once every two weeks on an average. Sometimes several times a week, and then perhaps there were intervals of three weeks or so in between."

Tiley testifies that in the spring of 1951 he viewed the demonstration given at the Philco plant and was very much impressed with it. One of the results of this demonstration was the writing of his disclosure since, according to Tiley, Mr. Bradley became "very insistent that I write that disclosure." Prior to that time Tiley claims that he had been busily engaged in developing the process and just simply hadn't taken the time to write the disclosure on it.

Tiley states he entered the date of conception as of March 15, 1950, in the invention disclosure he signed on May

16, 1951, because at the time of drafting and signing the disclosure, "I had an accurate remembrance of knowledge of the details of this case." Tiley further testifies, "It covers the photographic screen deposition method invented by myself. It details the process that was invented and developed in this plant during the period from May 15 to—well, into 1951."

When asked as to the extent of his participation in the project relating to the photodeposition of phosphors on screens of cathode-ray tubes during the latter half of 1950 and the early part of 1951, Tiley testified he spent most of his time during the summer of 1950 on the project and that after the beginning of 1951, his duties were mostly of the consulting type. He states that "there was a transition from carrying the ball in research to transferring this function to the Lansdale division." In the spring of 1951 his participation seemed to diminish and he "was out of the program effectively" by about the middle of 1951.

(2) Payne

P. Donald Payne, Jr., who had been awarded a B.S. degree in chemistry at Ursinus College, was employed as a junior engineer at Philco commencing on May 22, 1950. He first worked in the chemistry laboratory for about two weeks and then was assigned to work under Sadowsky in the color-screening laboratory, making three-color screens by the silk-screening method, until August of 1950. He was then assigned to research "to work with John Tiley and learn the photodeposition method of preparing line screens that Tiley was developing," and he remained with Tiley until early in November. Payne states that upon starting with Tiley his instructions were "to learn everything that he has developed in this process and prepare to bring it to Lansdale," and that on or about the first of November he "went back to Lansdale and set this operation up to make tubes at Lansdale."

When Payne first visited Tiley in the Philadelphia laboratory on or about August 30, 1950, Tiley demonstrated the process he was working on:

"Yes, he—well, before I did anything physically with it, he ran through the entire process, making up the mixtures, explaining why and how, and applying the mixtures to plates and exposing them and developing them, and ran through the entire process."

After Tiley's demonstration on August 30, 1950, Payne filled out a Philco research laboratory record (Tiley Exhibit 32) on the subject of photodeposition of phosphors and had Tiley sign the description. It consisted of a tabulation of a formula for making a spray mixture, the use of p. v. a. or of Elvanol, and the various steps concerning baking, spraying, and the use of a mask.

On August 31, 1950, Payne again recorded on a Philco research laboratory record (Tiley Exhibit 57), under the subject of photodeposition of phosphors, similar information setting out the procedure used and the method of exposure with a carbon arc lamp,—"information received from J. Tiley on 8–30–50 trip to Philco." Payne explains his work at Philadelphia in the following terms:

"A. Yes. Well, as I mentioned, during the months of September and October I worked here with Tiley. At or about the first of November I went to—I went back to Lansdale Tube and set this operation up to make tubes at Lansdale.

"The work done down here (Philadelphia) had been on glass plates, flat glass plates, which we then mounted with hardware inside a tube, sealed the bulb, the bulb together, and finished the tubes from those.

"The work done at Lansdale was done directly on the inner surface of the face panel and the tubes processed from there.

"Q. That is, the screen was formed on the face plate of the tube?

"A. That is right, and exposure then was carried out through the line master and through the face of the tube to fix the phosphor.

"The silk screening of plates to be mounted in tubes was continued through October 16, 1950, and once the photodeposition process was set up at Lansdale no further work was done with silk screening."

(3) Bradley

William Earl Bradley, director of research at Philco during the early 1950's, first became acquainted with John Tiley in the early 1940's when Tiley was working in the Philco factory with test equipment. Bradley testifies that Tiley had little formal education but had studied a "great deal of chemistry"; that Tiley "had an astonishing record of success on his projects" and was "very excellent" in inventive ability; that "as to a practical knowledge and system in engineering" Tiley's knowledge was "in electronics and chemistry, excellent"; that under Bradley's supervision at Philco Tiley had obtained "more than 15 or 20" patents; and that "the other thing he did which I greatly value was the invention of the process of depositing the phosphor screens on color television tubes." Bradley further testifies that Tiley generally promptly reported on his inventions verbally but not in writing. Consequently, Bradley "was frequently in the position of asking him to write an explanatory note or write a patent disclosure" and this was done with respect to the photographic deposition process of phosphors (14 months after the alleged invention).

When asked how he first learned about Tiley's photographic deposition of phosphors, Bradley replied:

"A time, sometime between January and May—pardon me—January and June, early spring is my recollection, of 1950. This was at that time an outstanding problem, how to deposit color phosphor lines on the type of tube which we had conceived and how to build. Tiley knew of that problem and of the difficulty of it. He told me that he had had an idea, that he wanted to try involving the use of photoengraving techniques. He appeared in my office * * *. It was the spring probably before May and certainly before the end of May in 1950 that he appeared in my office with small glass plates the size of lantern slides, plates on which were beautifully defined lines of phosphors. He said that he had made these by using a photo-resist, and an arc light, and the shadow of a mask so that—and then washing off the unhardened gel."

Bradley's attention was directed to his report covering the month of May, 1950, (Tiley Exhibit 5):

"One of the most striking developments of this period has been the discovery by Tiley, Sadowsky and Bocciarelli that phosphor may be deposited by an optical process employing hardening of polymeric materials by potassium dichromate. This process, since it is governed by photographic techniques, is capable of extreme accuracy and uniformity as has been clearly demonstrated on the small test plates (it also provides the best method for depositing of phosphor dots for the RCA type tube).

When asked to explain the inclusion of Bocciarelli and Sadowsky, Bradley responded:

"Yes, Mr. Bocciarelli was at that time Mr. Tiley's supervisor administratively. Mr. Sadowsky or Dr. Sadowsky at Lansdale was the person upon whom he relied to put any process into the actual tubes. I was exceedingly anxious that they work as a team. This report was intended for official scrutiny. They had been working reasonably well as a team. Sadowsky and Bocciarelli disapproved of Tiley's suggestion of the use of the photodeposition process and resisted it."

and

"I had given my reasons generally that I was anxious to include Bocciarelli and Sadowsky in this team for official recognition for what I considered to be a valuable development in the hopes that they would then be perhaps motivated to carry on with it in spite of their first reluctance to do so."

Bradley further testifies that as of August 31, 1950, Sadowsky was endeavoring to make line screens, using the silk-screen process; that, prior to August, Tiley had visited Sadowsky several times and he believed a joint project to use the photographic method was in fact beginning out there (Lansdale). Bradley's testimony is that almost all of the work on the photographic method had been done in the Philadelphia plant by Tiley and his helpers.

Bradley was obviously interested in conveying the impression that Sodowsky and Bocciarelli were enthusiastic about the silk-screening method and were opposed to the photodeposition method, while Tiley alone was interested in the development of photodeposition: "To my knowledge, it was originated by Tiley as far as I could tell, and he spoke to me frequently about it, and I had firmly in mind the fact that Tiley, the process of photodeposition had been nominated by Tiley."

Bradley stated that until a day or two before his testimony was given he had not seen the following documents produced from the Philco files:

(1) Copy of the Sadowsky RCA disclosure (Law Exhibit 21) found in the Tiley patent application file bearing the stamp date May 29, 1950.

(2) Earnshaw to Denk memorandum of May 8, 1950 (Law Exhibit 34) bearing the initials "A.V.H." wherein is discussed Sadowsky's call relative to his RCA disclosure and to Buckbee-Mears' progress with photodeposition.

(3) Buckbee-Mears' letter dated May 5, 1950 (Law Exhibit 53) discussing photodeposition.

(4) Sadowsky's progress report for the week of May 4–10, 1950 (Law Exhibit 15), wherein it is stated that photolithographing (bichromate process) had also been tried and is being continued.

Throughout his trial testimony Bradley again and again volunteered his conclusion that Tiley was the inventor. An examination of his June, 1961, deposition testimony reveals the same tactic. For example, when asked on direct examination to state his understanding of the invention, Bradley stated:

"Yes. The invention relates to a means of attaching patterns of luminescent materials to the face of a cathode ray tube, or to a transparent screen mounted within a cathode ray tube. *The inventor was John Tiley,* and the invention solved for us a vexatious problem.

\* \* \* \* \* \*

"We were pondering the problem of making this when Tiley came into my office in the spring of 1950, and showed me such lines deposited on a small glass plate. And these were so accurately placed and so sharp and seemed to be so satisfactory that we were encouraged to put such lines in cathode ray tubes. The process was immediately successful, and became the basis of the so-called Apple Tube Program which flourished at Philco for several years subsequently."

With reference to his early June report on activities for the month of May, 1950 (Tiley Exhibit 5), Bradley explained:

"I mentioned Sadowsky and Bocciarelli here because they were the ones concerned with the actual making of tubes, and I was actually trying to encourage them to take up *the process by Tiley,* and *Tiley was the inventor and the sole inventor,* but Sadowsky and Bocciarelli's cooperation was necessary to make these tubes, *using the Tiley invention,* and this is why I mentioned them in this connection in the official report." [Emphasis supplied.]

In addition to this, the precision with which Mr. Bradley was able to testify to the dates and substance of oral conversations which had taken place ten or fifteen years in the past, raises grave doubts as to his veracity. Nor is his explanation as to his ability to remember dates particularly convincing:

"I remember them geometrically in a peculiar pattern, and it just happens a certain· time period exists in my

recollection when this came to my attention. It was a time period in which many other events also took place. It was a very exciting time period, and I remember it as associated with the early spring of 1950, but I do not know exactly what date or what month."

On cross-examination it was brought out that the instant case is not the first interference proceeding in which Philco used Mr. Bradley's "ability" to recall the dates and particulars of purported oral discussions which had taken place several years before.

 After reviewing the testimony of Tiley, Payne, and Bradley, I find no believable evidence that Tiley had in the exercise of his inventive genius conceived the principle of photodeposition of phosphors. Moreover, in regard to references in the various Philco reports to progress made with "the method developed by Tiley," or "the process developed by Mr. Tiley at Lansdale," or "the photodeposition process by Tiley," I am thoroughly convinced that these references relate to Tiley's work on a process for reducing to practice the photodeposition principle, rather than to its conception. Tiley's work was associated and coordinated with Sadowsky's continued efforts to reduce to practice a reproducible multicolor cathode-ray television tube. Tiley had set up equipment, had selected materials and spray techniques, and had decided upon a front projection of light. This was his "process" or "development" and Sadowsky, who had known photodeposition for a year and a half, took over the Tiley equipment and one-piece bulb front projection method in an effort to continue on with reduction to practice efforts. These efforts were continued by Philco until the front projection method or process was abandoned in 1953.

Sadowsky, who had known of Law's original conception of photodeposition of phosphors (November 15, 1948) and had tested the principle (January 4, 1949), surely was not referring to a conception by Tiley of photodeposition when he stated in a report (Law Exhibit 18D) covering the period August 24 to September 29, 1950: "Meanwhile plans have been made to set up the process developed by Mr. Tiley at Lansdale."

FINDINGS OF FACT

It is the determination of this court that all of the proofs, "old" and "new," relating to the issue of originality of invention carry a thorough conviction that:

1. Sadowsky during the latter months of his employment with RCA learned that Law had conceived the principle of photodeposition of phosphors, which principle Sadowsky tested and understood before he terminated at RCA.

2. Sadowsky found upon commencing employment with Philco on February 1, 1949, after eight years with RCA, that his associates at Philco expected and required him to reveal all pertinent knowledge, including confidential information, which he had acquired at RCA; and that Sadowsky was willing to, and did in fact, give confidential RCA records to Philco, including a copy of the photodeposition of phosphors patent disclosure which Sadowsky had submitted to RCA on January 18, 1949.

3. Sadowsky, as an employee of Philco, at least from September, 1949, engaged in an intensive search for the best means of making three-color phosphor screens for use in cathode-ray television tubes, including the photodeposition of phosphors method, and through Sadowsky's work, teachings and reports, his associates at Philco, including Tiley, were, in April and May of 1950, informed of Sadowsky's knowledge, work, and progress, including knowledge of the conception of photodeposition of phosphors which had been conceived by Law on November 15, 1948.

4. Sadowsky's revelation to his associates at Philco of the photodeposition principle conceived by Law, and Sadowsky's subsequent work in testing and experimenting with the principle embodied in the Law invention were the determining factors in the Philco decision to attempt to reduce to practice a method of photodeposition of phosphors.

5. Tiley, an assistant to Sadowsky, played no part in the conception of the principle of photodeposition of phospors, but rather, in June, 1950, was assigned to the task of attempting to devise the laboratory equipment, materials, and method of exposure to be used in an attempt to reduce to practice the principle of photodeposition of phosphors.

6. Sadowsky and his associates at Philco, including members of the patent department, acted wrongfully in using at Philco confidential knowledge that they knew was the property of RCA, particularly the copy of Sadowsky's RCA patent disclosure which Philco had available in the Tiley patent application file.

## III. REDUCTION TO PRACTICE

In view of the holding that Tiley derived his invention from Law through Sadowsky, a determination of the reduction to practice issue is not herein necessary. However, it is our feeling a determination of this issue should be set forth as it may facilitate complete disposition of the case on appeal.

It is plaintiff RCA's position that Philco did not reduce the invention to practice at any time prior to Law's constructive reduction to practice on July 30, 1951; that Philco was obtaining unsatisfactory results and had not yet succeeded in working out practical solutions to the problems facing it; that the Board of Patent Interferences erred in concluding that Philco reduced the invention to practice in April, 1951, when it demonstrated one of its tubes to Philco personnel; that, because the present invention relates to a method for use in the manufacture of color cathode-ray tubes, reduction to practice of the method requires that it be developed to such a stage that it could be relied upon to make tubes on a reproducible basis with the required characteristics.

Plaintiff RCA asserts that the record clearly shows that the Philco tubes lacked the required basic characteristics, such characteristics being (a) color balance, (b) adequate index, and (c) satisfactory phosphor patterns.

Defendant Philco contends that in the first week of April, 1951, it installed and successfully demonstrated a multicolor phosphor screen which had been formed by the photographic method defined by the interference count; that its April demonstration was witnessed by engineers and executives then employed by Philco corporation; that the depositions of several of the witnesses to the demonstration were taken in the interference proceeding and their testimony was supported by three contemporaneous documents attesting to the production of the pictures in full color; that this evidence established that the photographic method of forming multicolor phosphor screens as defined by the count has utility for use in electronic apparatus for the production of color pictures, and that accordingly, Philco met the legal requirements for actual reduction to practice.

Further, defendant Philco asserts that the Board of Patent Interferences after examining the evidence before it held that Philco had sufficiently reduced its invention to practice, and that the additional evidence and documents presented in this court are merely cumulative with that considered by the Board of Patent Interferences.

The major portions of the approximately 8,000 pages of record considered by the Patent Board and of the 6,000 pages of record made in this court are related to the reduction to practice issue. This court has studied this material for a period of several months and is thoroughly convinced that the Board of Patent Interferences erred in determining that Tiley by April of 1951 had reduced to practice the invention claimed in the count.

It is the established rule that "reduction to practice" must produce something of practical use, coupled with a knowledge, preferably by actual trial, that the thing will work practically for the intended purpose, and if, as a matter of practice, a conception falls short of success, it is not a sufficient reduction to practice, notwithstanding it may give rational hopes of future fulfill-

ment of the purposes at which it aims. E. I. duPont deNemours & Co. v. American Cyanamid Co., 120 F.Supp. 697, 702 (D.D.C.1954).

■ As of the date of RCA's constructive reduction to practice, we find that Tiley and Philco had failed to produce something of *practical use*. The Philco records reveal that a satisfactory method for manufacturing line screen index type color television picture tubes had not been developed. Tiley and Philco were beset with continuing difficulties and the screens deposited were erratic and unreliable. The tubes made were not reproducible. Moreover, problems relating to color balance, index, and phosphor patterns continued until long after Philco's claimed date of reduction to practice.

At the conclusion of trial this court informed counsel that it considered the issues presented for determination fundamentally issues of fact, rather than of law, and requested the parties to file in accordance with a suggested outline proposed findings of fact and conclusions of law. These post-trial products of counsel have been extremely helpful as an aid in understanding this technical and complicated case. After thoroughly examining and analyzing the pertinent evidence, I find that the RCA proposed finding of fact on the issue of reduction to practice is completely in accord with my own findings on the issue. Consequently, I have decided to adopt it. Cf. Nyyssonen v. Bendix Corporation,

342 F.2d 531 (1st Cir. 1965); Roberts v. Ross, 344 F.2d 747 (3d Cir. 1965). Accordingly, I expressly adopt in slightly modified form the substance of the section of RCA's proposal entitled, "VII Philco's Alleged Reduction to Practice," (pp. 48–92) and incorporate it herein as a portion of this opinion.[2]

## A. PHILCO'S REQUIREMENTS

### 1. *Philco's need for color balance*

A color television picture tube produces white light by a combination of red, blue and green light obtained from the red, blue and green light-emitting phosphors (PX 2–D).

It is a necessary requirement not only that individual colors be reproduced correctly, but that the colors be "balanced" so as to be capable of correctly reproducing a white or near white portion of a picture.[1]

This requirement is referred to as the need for "color balance" or a "balanced white"—these expressions being used interchangeably.

Dr. E. W. Herold, RCA's expert witness, testified that the line screen index tubes on which Philco was working should be constructed to meet the criterion of providing "built-in" color balance—that is, that the phosphors should be so balanced as to provide white light when uniformly excited by the electron beam[2]—without the provision of any special "color balancing circuit" for changing the strength of the beam as it passes from line to line.

2. The following system of references is employed:
 TR = Tiley Patent Office record
 PX = Plaintiff's trial exhibit
 DX = Defendant's trial exhibit
 LX = Law's Patent Office exhibit
 TX = Tiley's Patent Office exhibit

1. Thus, a white object (for example, a page of a book) when reproduced on a color picture tube, should look white—not some other color. Also, correct reproduction of flesh tones (for example, as in a person's face) is an important requirement. When the viewer knows what color to expect, he may be very

critical of a picture where lack of color balance produces something different (for example, green instead of white or a flesh tone).

2. *The green phosphor is ordinarily more efficient than the red and blue phosphors. Accordingly, even if the phosphor lines are of equal width and thickness, the overall appearance of the screen may tend to be greenish when electron beam uniformly excites the three sets of lines. A procedure for counteracting this effect is to dilute the green phosphor with an inert material.*

Herold's position is fully supported by Philco's contemporaneous documents:

(a) A Philco report written by Tiley on September 5, 1950 (at or about the time Philco's tube development program began) stating that the screen must *"have balanced color (to produce a true or nearly true white) over the face of the tube * * *."* (TX 25).

(b) A Philco report of June 29, 1951 (written shortly after the April 1951 demonstration relied upon by Philco), saying:

> "To be satisfactory in a color display, a color line tube must meet the following specifications:
>
> \* \* \* \* \* \*
>
> "3. The white point of the tube must fall within conventional *specs* for commercial black and white tubes * * *." (PX 7–A).

(c) A Philco memorandum (Fink to Ishler) dated August 28, 1953 (PX 32, DX 6), stating:

> "I think it is well recognized throughout the Research and Engineering groups working on the Apple program that *the construction of the Apple tube should permit white balance to be controlled by the design of the tube,* under all contemplated conditions of operation, provided that the problems of line

width and phosphor density are controlled as otherwise required." [3]

These documents show that Herold's criterion of built-in color balance is a re-statement of Philco's own stated requirements.

Philco's expert witness, Dr. R. M. Bowie, challenged Herold's criterion of color balance built into the tube, saying that it was unreasonable.

On cross-examination, however, Bowie was shown a number of publications by Philco engineers, which Bowie admitted were in accordance with Herold's criterion—built-in color balance.[4]

Bowie also admitted that the Philco memorandum written June 29, 1951, specifying the "white point of the tube" (supra), was "in accordance with Dr. Herold's criterion."

Bowie's position on direct examination had been that, instead of having color balance built into the tube, the receiver in which the tube is to be operated should be provided with a so-called "color balancing circuit." The record is clear, however, in showing that Bowie's 1966 proposal of seeking to cure lack of color balance in the tubes by means of "color balancing circuits" was not Philco's 1951 objective.

(1) Bowie sought to base his proposal on some RCA patents and publications including circuits which, according to

---

3. The remainder of this memorandum also shows that as late as 1953 Philco did not expect to use a color balancing circuit, although, as a precautionary measure, Philco was, on a low priority basis, considering the design of such a circuit for the future.

4. Such publications include:

(1) *Proceedings of IRE*, September 1956, pp. 1115–19, by Sadowsky and other Philco employees (LX 177), stating (p. 1117):

"*Correct white balance is built into the screen of the Apple tube. * * ** a constant, unmodulated beam produces white."

(2) *Proceedings of IRE*, September 1956, pp. 1120–24, by four Philco employees (Bloomsburgh, Boothroyd, Fedde and Moore) (PX 51), stating (p. 1124):

"The colorimetric white point of the picture is *determined by the CRT screen* and there is no static or dynamic white balance problem."

(3) *IRE Convention Record*, Vol. 5, Part 3, March 18–21, 1957, by Payne and other Philco employees (PX 52 p. 238):

"This increase in brightness has been obtained while still maintaining the '*white balanced' feature of the screen;* that is, scanning the screen with an electron beam of constant intensity still produces the white we desire for monochrome pictures."

(4) *IRE Convention Record*, Vol. 5, Part 3, March 18–21, 1957, by Philco employees Chatten and Gardner (PX 53 p. 230):

"To produce white, an equal amount of current is directed to all stripes \* \* \*."

Bowie, Philco *could have* used for color balancing. But Bowie did not establish that it was Philco's objective to use such circuits. Indeed, as Bowie admitted on cross-examination, none of the 13 Philco patents contained in PX 59 (each of which includes a line-screen index tube and associated circuits) discloses a color balance control circuit.

(2) Both Herold and Bowie agreed that any proposed color balancing circuit in the receiver would require that the index circuit operate to provide indexing to the picture signal grid of the tube at all times, even when only a black-and-white picture is being transmitted. But Herold and Bowie disagreed as to whether this necessary condition would in fact normally be satisfied. Herold had testified that normally one would expect the indexing system to be turned off when such a color television receiver receives a black-and-white program,[5] and Bowie sought to contradict this testimony.

Bowie testified that he had made a study of patents and publications on line screen index-type receiving circuits, including those relating to the Philco tube, and had found no case where means for turning off the index circuit was provided, referred to or suggested. Based on this, Bowie contended that it would be unreasonable for such an arrangement to be used. But he retreated from this position on cross-examination when confronted with the following Philco documents:

(a) Philco circuit diagram (PX 56) dated February 2, 1952, which is Philco's earliest circuit diagram of a complete Philco color receiver. Bowie admitted that he had not seen this circuit prior to giving his direct testimony, and that it was in fact arranged so as to "kill" (turn off) the index circuit during black-and-white reception.

(b) Philco's Fedde patent No. 2,917,576 (PX 57), describing a color television receiver with an index type tube, which Bowie had not previously seen. Bowie admitted that, in the operation of the circuit of that patent, "the index signal being fed to the picture tube would discontinue upon reception of black and white signals."

(c) Philco's Moore patent, No. 2,833,852 (PX 58), applied for March 10, 1951. Bowie admitted that when the receiver was receiving a black-and-white signal, there would then be a zero level of index signal on the grid of the picture tube.

(d) A group of 13 Philco patents (PX 59). Bowie admitted that, in the operation of the circuits of those patents, when the receiver was receiving a black-and-white signal, there would be zero level index signal applied to the picture signal grid, as in Philco's Moore patent discussed above.

In seeking to explain the inconsistency between his testimony on direct examination and his later admissions with respect to these circuits, Bowie advanced a purported distinction between the application of *no* index information on the control element (grid) of the tube and the application of what he called *"zero level"* index information. He said the distinction was like the "difference" between having a bank account with *zero balance,* and *not having* a bank account:

"You might have a bank account. Despite the fact that the balance might be zero, you still might have a bank account. There is a difference between having zero money in your bank and not having a bank account."

This "explanation" is so unconvincing that it does not require comment. The practical effect of zero level index and no index is the same—there would be no

---

5. In discussing "built in" color balance, Herold had explained that, during reception of a black-and-white program, the tube would normally operate exactly like a black-and-white tube—that is, the indexing circuit would be turned off—so that the "white" produced would be whatever color the phosphors would produce, and if the phosphors were properly applied in the correct balanced relationship, they would produce a white picture.

index available to operate in a color balancing circuit.

---

The effect of these admissions by Bowie is to show the soundness of Herold's position that the Philco tube required built-in color balance and that Bowie's proposal of using color balancing circuits represents his 1966 view—not Philco's 1951 objective.[6] And Philco cannot now explain away defects in its line screens by attempting to apply to those screens criteria which others have applied to shadow mask tubes. To do so would be to disregard Philco's own 1950 and 1951 criteria by which it evaluated its screens.[7]

### 2. *Philco's need for satisfactory index signals*

In a line screen tube of the type on which Philco was working, there was a requirement that there be provided some means for producing an index signal, to synchronize the color information applied to the tube with the motion of the electron beam.

At the trial, defendant sought to minimize the importance of the index signal, in the present controversy, on the ground that it is not specifically recited in the count. But in Philco's tubes, the index signal resulted from the difference in the secondary electron emission characteristics of the phosphor lines and the index lines, so that the matter of indexing is necessarily material to the issue of whether Philco had produced satisfactory tubes in its efforts to practice the invention.

Philco's witness Bowie sought to minimize the importance of index on another basis. He testified that in his opinion one can operate a phosphor-line screen tube without using index at all, but Bowie was not there referring to a tube of the type on which Philco was working. Instead, he was referring to a tube having *horizontal* phosphor lines, in which the beam scans *along* the lines,[8] which is materially different from the arrangement of the Philco tube in which the phosphor lines are *vertical* and the beam scans *across* the lines.

The fact is that an index signal was a practical necessity in the Philco tube, and it was so stated in the Philco memorandum from D. G. Fink, Philco's director of research and development, to William Balderston, Philco's president, dated August 11, 1952 (PX 7–B, p. 14):

> "Without an indexing system, the velocity would have to be precisely constant along the whole width of each scanning line. This is so difficult as to justify the epithet 'physically impossible.'"

There can be no serious question that a satisfactory index signal was a basic requirement of the tube which Philco was seeking to develop.

### 3. *Philco's need for satisfactory phosphor patterns*

Making screens satisfactorily by the method in issue requires depositing phos-

---

6. "The court cannot help but be concerned with that which is left unsaid in 1956 but is later asserted in testimony in a trial of 1965." Davis Harvester Co. v. Long Manufacturing Co., 252 F.Supp. 989, 996 (E.D.N.C.1966).

7. Another afterthought was a suggestion by Bowie that the same tolerance with respect to lack of color balance which is allowable for a *shadow mask* type tube should be allowed for the Philco *index* type.

 But the RCA shadow mask tube of which Bowie spoke has three electron beams, and if its phosphor screen does not have color balance, this can be coun-

teracted by adjustment of the relative strength of the electron beams. On the other hand, in the line screen tube on which Philco was working in the period extending through April, 1951, there was only one electron beam. The tube did not, therefore, lend itself to the same procedure as that which is possible in a three-beam shadow-mask tube.

8. Such a tube was referred to in a publication by RCA engineers (DX 3, pp. 1222–23), but there is no evidence that it was of any practical importance, and Bowie testified that he did not believe that he had ever seen a tube of that type working.

phor patterns (phosphor lines in the Philco tube) which adhere in the correct areas. It also requires washing off the phosphor in the other areas, so that phosphor of one color will not remain in an area designated for phosphor of another color.

The obtaining of satisfactory phosphor patterns depends upon a number of factors. One is the initial step of applying a suitable layer of phosphor and photosensitive binder; unsatisfactory screens may result if this layer is improperly applied—for example, if it is of insufficient thickness. Also, the condition of the surface onto which the layer is applied, such as its degree of cleanliness, may affect the adherence of the phosphor.

Unsatisfactory results may also come about during the "development" step of the method. (The "development" step is "subjecting the layer to said solvent to dissolve the layer in the unexposed areas," as stated in the count.) If, during the development step, too much phosphor is removed, the phosphor areas of the resulting screen will be either nonuniform, or insufficiently thick, or both. If the phosphor is not entirely removed from the unexposed areas, then, when the next phosphor is applied, "cross-contamination" of the second phosphor by that remaining from the insufficient wash-off of the first will result, this being very undesirable.

The Philco records show that lack of phosphor adhesion, cross-contamination, smeared or broken lines, and other non-uniformities in the required phosphor line patterns were serious problems (infra, pp. 86–87, 91–96).

## B. PHILCO FAILED TO ACHIEVE ITS REQUIREMENTS

Analysis of Philco's results on the basis of its color tube data sheets (PXs 6–A, 6–B) and other Philco documents (PXs 7–A, 7–B, 33) shows that Philco failed to achieve its requirement of satisfactory color balance, index and phosphor patterns.

1. *Typical results shown by Philco's color tube data sheets, with respect to color balance and phosphor patterns, were unsatisfactory*

Philco's failure in the area of color balance and phosphor patterns in the period about April, 1951, and earlier may be seen from quotations from Philco's data sheets for a group of tubes in that period, which show the typically unsatisfactory results.

As to color balance and phosphor patterns, the data sheets in this period (PXs 6–A, 6–B) state:

| Sheet and Tube Nos. | Remarks |
|---|---|
| 37—V8— | "This tube has a very prominent 'bull's eye' with varied color rings. There seems to be a good deal of glass exposed between lines." [Jan. 1951] |
| 39—V9— | "General appearance of screen is green. Green and blue lines very fine and very smooth. Red line is thin and irregular. Considerable glass area exposed between lines. Has 'bull's eye.'" [Jan. 1951] |
| 39—V10— | "General appearance of screen in [is] green. Screen has a prominent 'bull's eye.' Looks as if MgO was almost completely covered by green phosphor." [Jan. 1951] |
| 40–V11— | "General appearance of screen is green with pink fringe around outer edge. All lines are relatively smooth except where colors have been smeared which includes most of the tube face. Has 'bull's eye.'" [Jan. 1951] |
| 41—V12— | "General appearance of screen is green with pink spot in center and pink fringes. Not much MgO showing. Faint 'bull's eye.'" [Jan. 1951] |
| 42—V13— | "General appearance of screen is green-white. Best color balance since plate tubes. Green and red phosphor lines smooth. Blue phosphor somewhat broken up. Green lines smeared in center of tube. Tube has water mark on screen. |

Not much MgO showing." [Jan. 1951]

43—V14—"General appearance of screen is rosy-pink. Red phosphor considerably smeared and broken up." [Jan. 1951]

44—V15—"General appearance of screen is blue with a pink center position. Green line is very dim. The blue line is broken up and smeared. The red line is smooth in spots." [Feb. 1951]

45—V16—"General appearance of screen is rosy pink. Has 'bull's eye.' Green line very dim, but smooth. Red and blue lines quite broken up." [Feb. 1951]

46—V17—"General appearance of screen is blue or reddish-blue. Green line very smooth but not very brilliant in color. Red line smooth except for areas where it is broken up. Blue line a little ragged. Color balance would probably be good if green line were not so dim." [Feb. 1951]

47—V18—"General appearance green with purple center section. Has 'bull's eye' and 'venetian blinds.' Tube appears to have a green, red and two blue lines, evidently one of the blue lines is the MgO line." [Feb. 1951]

48—V19—"Screen predominantly green. All phosphors are faded in color. Red and blue phosphors very much broken up." [Feb. 1951]

49—V20—"General appearance of screen is green. Phosphors are broken up and smeared with the green being especially so. Has faint 'bull's eye.'" [Feb. 1951]

50—V21—[No phosphors applied.]

51—AE1—"General appearance blue-green. Green phosphor very smooth. Red phosphor considerably broken up. Blue Phosphor line also broken-up in spots. With better red

line this tube might produce a reasonable white." [Feb. 1951]

52—V22—"General appearance of screen is slightly blue in center with red tinted edges. Phosphors are very smooth over most of the tube face. If green was a little more brilliant the color balance should be quite good." [March 1951]

53—AE2—"General appearance green center surrounded by reddish-purple. Blue line extremely smooth. Green line smooth. Red line considerably broken-up in center section." [March 1951]

54—AE3—"General appearance of screen is green. Phosphors are quite smooth with no smearing. Screen appears spotty about the outer section but these spots do not mar the signal nor colors of the phosphors." [March 1951]

55—AE4—"General appearance of screen is green. All phosphors are ragged. The green line appears to have a red line down through its center. Aluminizing is very thick. Brightness is very much a function of screen voltage." [April 1951] [9]

56—AJ0—"General appearance of screen is green. Two red lines in tube one of which must be the tungsten line. Aluminizing was very thick. Screen brightness was very much a function of screen potential." [April 1951]

57—AE5—"General appearance of screen is pale green. All lines are quite smooth." [May 1951]

58—AE6—"Moderately thick screen. General appearance green. Phosphors are quite smooth. Screen brightness very much a function of screen voltage." [May 1951]

59—AE7—"General appearance of screen is pale green. All lines are reasonably smooth." [May 1951]

9. On April 4, 1951, Payne, in his work on photodeposition of color screens, recorded, "The green willemite is much more efficient than the red or blue. Previous methods to offset this in producing a white screen have been *unsuccessful*" (sheet 38, notebook 3956, PX 33, TX 62).

60—AJ1—"Upper half of screen is pink, lower half green. All phosphor lines are quite smooth. Tungsten line appears to be under and next to green between green and blue. The screen is much thicker than previously received screens." [May 1951]

61—AE8—"Thick screen—general appearance pale green to green white with high beam current. Blue line very smooth. The red is a rusty color." [May 1951]

62—AJ2—"General appearance of screen is pale green to green white. Phosphors are reasonably smooth. Lines vary somewhat in width over tube face. Phosphor smeared slightly in two small areas. Screen is fairly thick." [May 1951]

These contemporaneous statements by the Philco engineers responsible for evaluating the Philco tubes show that the typical results being obtained by Philco as of the time of its April demonstration were a failure to achieve the required color balance or satisfactory phosphor patterns.

2. *Typical results shown by Philco's color tube data sheets, with respect to index, were unsatisfactory.*

Philco's tube data sheets also included data with respect to the *index* signal obtained from the tubes in tests by the Philco engineers. Ordinarily, the sheets included quantitative data giving numerical values of the index "yield" obtained in tests of the tube, and in many instances also specific explanatory comments regarding the index signal observed, such as whether it was uniform or non-uniform.

The significance of the quantitative index yield figures was that Philco's tubes needed an index signal of a required *magnitude,* in order to work properly in the circuits associated with the tube.

Herold, upon analyzing the index data, found that most of the Philco tubes made through July, 1951, had inadequate index (PX 8–A). Herold used a numerical standard of index yield, based upon Philco's own numerical standard as explained below, in evaluating the tube data. His evaluation was also, in some instances, based on the other explanatory information contained in the data sheets, for example, as to the uniformity of the index signals.

Philco's witness Bowie sought to minimize the importance of a numerical specification for index. He took the position that Philco's tubes should not be evaluated by a predetermined numerical standard, but that each tube should be tested in the equipment in which it was intended ultimately to be used, in order to determine whether or not the magnitude of its index signal would be acceptable. Thus, Bowie's position was essentially that he was unable to agree or disagree with Herold's findings that the individual tubes had inadequate index. Bowie could not formulate an opinion as to whether or not they would provide an index signal which would be large enough and otherwise satisfactory, without testing the individual tubes.

Herold, in evaluating the index data for the Philco tubes, started with *specifications by Philco's own engineers* that the minimum acceptable yield was 40%.[10] Herold then, in order to give Philco the benefit of the doubt, took approximately half that specified requirement, and used it as his standard in classifying Philco's tubes, based upon its data sheets. That is, tubes having an index yield of less than about 20.5% were classified by Herold as having inadequate index.[11]

---

10. A Philco document by Creamer and Moulton dated June 29, 1951 (PX 7–A) states that the minimum acceptable yield is 40%.

11. The Philco data sheets often included index yield values corresponding to different voltages on the screen of the tube. Herold used the index yield value corresponding to 20,000 volts on the screen or corresponding to the voltage nearest to that value.

Unquestionably Herold's standard .was a fair and reasonable one to use in judging the Philco tubes as to index, being even more favorable to Philco than Philco's own 1951 standard.

With respect to a group of nineteen tubes made just prior to and about the time Philco made its demonstration tube (tube AE–1, data sheet 51), Herold found the data to show that more than two-thirds of these (thirteen of them) had inadequate index, for the reasons which he explained.[12]

### 3. *Herold's chart summarizing Philco's results shows the patern of predominantly unsatisfactory results*

The overall pattern of Philco's results for the period up to and including July, 1951, is summarized in a chart prepared by Herold (PX 8–A).

Herold testified that in his chart the presence of an "X" showed a defect as to color balance, index, or phosphors, based upon his analysis of the Philco data (PXs 5, 6–A, 6–B, 8, 8–A). The absence of an "X" did not necessarily mean the absence of a defect, because there might be insufficient data; also, certain types of defects would not show up in the information contained in the data sheets.

Herold explained in detail, both generally and by examples, how he analyzed individual tube data sheets and the basis on which he classified them in his chart.

Defendant sought to challenge some of Herold's analyses of individual tubes —this challenge consisting mainly of skipping between isolated borderline cases. But Philco's tube data sheets themselves show that Herold's chart PX 8–A is, on the whole, a fair evaluation of the pattern of results which Philco obtained, for the period through July, 1951, and the admissions contained in other Philco documents confirm this.

From his analysis of Philco's documents, Herold found that Philco was

"* * * beset by a very large number of problems. When they used a heavy irridized coating, the phosphors were difficult, it was difficult for the phosphors to adhere to this heavy irridized coating. When they used a light irridized coating, their index signal wasn't satisfactory. The color screens did not have a balanced white in most cases, and in some cases they were non-uniform, and the color balance varied over the face of the screen. The phosphor lines were often ragged and broken up. The index signal was sometimes too low to be useful. In other cases it was quite non-uniform, and this caused difficulty in use."

### 4. *The admissions contained in other Philco documents also show unsatisfactory results in the period just prior to April 1951*

Philco's documents other than the tube data sheets confirm Herold's findings.

Many of the documents were the subject of testimony by Herold, and in many cases where the documents related to the chemical aspects of the photodeposition work done by Philco's Payne, they were explained by Austin E. Hardy, an RCA expert in photodeposition, a field which has been his business for the past twelve years.

---

12. These are the first nineteen tubes in the group covered by the data sheets referred to supra, pp. 214–216. The index yield values (at 20 kilovolts screen voltage) for the tubes in this group which had inadequate index were those corresponding to data sheets Nos. 37 (yield, 16.8%); 38 (yield, 10.1%); 39 (yield, 9.1%); 40 (yield, 20.2%); 41 (yield, 10.1%); 43 (yield, 5.6%); 44 (yield, 3.4%); 46 (yield, 9.4%); 48 (yield, 17.9%); 51 (yield, 13.4%); 53 (yield, 15.7%); 54 (yield, 12.3%); 55 (yield, "Very Small").

Of the remainder of the tubes referred to in the previous section (pp. 214–216), the data sheets show inadequate index for the tubes corresponding to the following data sheets: Nos. 56 ("Signal was too small to take measurements"); 58 ("The signal over a large area in the center of the tube is low and very non-uniform"); 60 ("A small area in center of tube about ½" in diameter gives off almost no signal"); 62 ("This tube also has a small area in center of tube about ½" diameter which gives very little signal").

Philco's documents included the following important admissions:

December 20, 1950

Report by Emerson (PX 30):

"H. Affel reported that it now appears that the original line phosphor index system *will not work.*

December 28, 1950

Draft of progress report by Creamer (PX 29):

"Screen quality has in general decreased, with *broken lines, spotty index, spray marks, and stains becoming the rule.* Plate tubes (made here) have been different but not markedly better than on the face tubes made at Lansdale. *Index yields continue low and not wholly explainable* with only two tubes above average. *Line widths and spacings continue to vary considerably from tube to tube.* Color balance has not exceeded and seldom approached that of the reference tube. *Most tubes are green or greenish white with random purplish areas.*"

With respect to the index signal obtained, the same report said:

"*One fact which has stood out in all the experimental work has been the large variations within a single tube.* Most of these variations appear quite random and hence without pattern, although certain behaviors have been noted. *The magnitude of the variations seriously interfere with the observations.*"

January 24, 1951

Notes by Payne (PX 33, TX 62, p. 25):

"*Bugs as of 1-24-51*

\* \* \* \* \* \*

"In attempting to get a thicker deposit of phosphor the exposure time is lengthened. This results in a *poor washoff,* apparently due to scattering of the light by the white phosphor particles, causing deposition in between the lines. We are trying to minimize this by reducing the amount of photosensitive solution per *gram of* phosphor in the spray mix."

The "poor washoff" meant that the phosphor of one color would remain in areas where it was not intended to be. This same entry by Payne also referred to the fact that "the phosphor of the second line adheres to the first line." This meant cross-contamination, which is very undesirable.

January 25, 1951

Report by Emerson (PX 7-A, LX 5):

"The principal faults with the color picture tubes being received from Lansdale are:

"1) *Low secondary emission signal*
\* \* \*

"2) *There is a considerable lack of uniformity of the width and density of the color phosphor line.*"

January 26, 1951

Notes by Payne (PX 33, TX 62, p. 26):

"MgO-Glass trouble \* \* \* makes heavy soup which *thickens on standing.*"

Hardy explained that this related to a chemical problem associated with the use of magnesium oxide and that this would produce results which would be quite erratic and which would vary considerably depending on how long the material had been left standing. Magnesium oxide, which Philco typically used as the index material, would have a tendency to stick to any surface, and to be difficult to remove. Furthermore, magnesium oxide very seriously impedes the photosensitivity of dichromated polyvinyl alcohol.

January 26, 1951

Memorandum by Sadowsky (PX 7-A, LX 36):

"We don't know why the *secondary emission varies from bulb to bulb and one part of the screen to another.* It is possible that part of this may be due to *non-uniformity of deposition.*"

February 3, 1951

Notes by Payne (PX 33, TX 62, p. 22):

"Need better spray pattern—45° extension gives *heavy ring between light center and edge.*"

Hardy explained that this related to the difficulties in spraying the phosphor and the polyvinyl alcohol into the bulb in which the screen was to be formed. The obtaining of an uneven distribution of the material on the inside face of the bulb was undesirable because the thickness variation may remain in the printed pattern, and also the width of the lines being printed could vary with the thickness.

February 23, 1951

Notes by Payne (PX 33, TX 62, p. 30):

"*MgO line under green on standard screen does not give sufficient secondary emission.* Tried putting 25% MgO in green on top of MgO line. This requires filming. 4.0 min. exposure gives good line.

"2–26–51. However, the suspension containing MgO, Green, and stock solution *goes bad in a couple of days—thickens and smells of ammonia.* Gave MgO 6 min. exposure and cut green exposure to 3 min.

"2–28. By the time the screen was completed, most of the green had washed off. Will go back to 4 min. exposure on bulbs 26 & 28."

The first sentence of the entry is important because it meant that the arrangement used on Philco's then "standard" screen, namely, the arrangement in which the index line was applied under the green phosphor line, did not give sufficient secondary emission (index signal).[13]

The entry to the effect that the stock solution "goes bad in a couple of days—thickens and smells of ammonia" was explained by Hardy as "another manifes-

tation of the chemical instability" and "a very bad effect. It means that there is a pot-life problem. It means that the system is not stable" and that if the material is used at different times, "the results obtained with this material will be erratic and not reproducible."

February 1951

Progress report by Creamer (PX 7–A):

"In spite of the high index yield on the low resistance iridized face plate tubes, it should be pointed out that *none of the bottles received, with the exception of the one in today, is suitable for use in systems work.* This is because they were made with the new 25 mil mask. This mask has a serious periodic error every $\frac{1}{4}$ inch which is equivalent to a change in sweep velocity of 10% over this interval. *Our index servo systems simply can not track this violent change in the signal.*"

Herold testified that the report meant that a tube with such an error "would not work" in the Philco system at that time.

March 5, 1951

Notes by Payne (PX 33, TX 62, p. 31):

"Will try hot caustic, then organic solvents. Hot caustic helps in some cases. In others the second application adheres, whereas the first *washed off.*"

This entry relates to difficulties with lack of adherence. Hardy explained that because Philco used bulbs having "irridized" (tin oxide) coatings, only mild cleaning agents could be used in cleaning the glass prior to applying the phosphor. This led to difficulties with lack of adherence of the materials applied. Hardy explained that the effects described did not surprise him because, when a bulb is reused or given a second application,

13. Philco demonstration tube AE-1 (bulb No. 25), the screen for which was made on February 21, 1951, was of the "standard" arrangement (p. 24, Payne notebook 3956, PX 33, TX 62) and had the magnesium oxide under the green phosphor line (TX 36).

adherence may be improved, but Hardy explained that this is not a reliable treatment, because the improved adherence would only occur in certain areas.

March 5, 1951

Notes by Payne (PX 33, TX 62, p. 32):

"Mr. Sadowsky suggested the addition of an external mix to add to the drying effect of the air, as one of *our main problems has been to get the spray dry enough and still have it continuous.* * * * This setup *lent no visible improvement* in dryness of spray * * *."

Hardy, in explaining this entry, brought out that if the spray is too wet, it would lead to gross non-uniformities and, on the other hand, if the spray is too dry, the material may not adhere, or may adhere only in a patchy manner.

March 12, 1951

Notes by Payne (PX 33, TX 62, p. 34):

*"We have had much trouble making the lines stick after washoff."*

The entry made it clear that the trouble was that the lines "peel off in spots" and the "phosphor washes off." (PX 33, p. 34).

March 12, 1951

Report by Ishler (PX 7–A):

"Improvement in the screen uniformity has been obtained with the latest spray gun. *Irregularities of screens are being caused by a defect in the face plate of the tube,* as well as irregularities in the low resistance internal conductive coating."

Herold explained the principles by which Philco's use of a front projection photo-deposition procedure, wherein light must pass through the glass faceplate of the tube in exposing the photo-sensitive layer, would enable defects in the face plate of the tube to produce irregularities in the screens.

March 16, 1951

Report by Emerson (PX 7–A, LX 9):

"K. Ishler indicated *it will probably be quite some time before tubes with good screens are obtained."*

March 27, 1951

Notes by Payne (PX 33, TX 62, p. 36):

"Gave most even screen to date, also heaviest, however *predominantly green as usual.* Will try diluting green—Miriam suggested using ca 10% red as neutralizer."

Philco must have found that this proposal did not solve its problems because it was "Not continued in other bulbs," as stated in a later Philco document dated April 30, 1951 (PX 7–A).[14]

March 28, 1951

Color Tube Report (PX 7–A):

"The screens have improved considerably in smoothness of phosphors, but the red line doesn't stick too well in the center of the tube. Consequently *the red line is usually broken-up in the center."*

A number of Philco's color tube data sheets also described broken-up phosphor lines.

March 1951

Progress Report by Creamer (PX 7–A):

"Screen quality has noticeably improved, the principal complaint being the fact that *no tube yet received on the face plate has had all phosphor lines adhering uniformily [sic] all over.* The low resistance faces seem to offer more difficulty and *large patches of no signal and little phosphor are often observed."*

Herold testified that the "large patches of no signal and little phosphor" is very undesirable, and would lead to a total loss of color in those patches.

---

14. Sadowsky, like Herold and Hardy, regarded this proposal as undesirable, according to a Payne entry of April 6, 1951 (PX 33, p. 38).

April 2, 1951

Report by Bradley (PX 7–A, TX 18):

"Experimental line phosphor color television tubes at Lansdale have been rather inadequate lately partly due to *difficulties with phosphor adherence* to the EC coating on the face plate. The low resistance EC coatings are slippery and poor screen quality results. John Tiley, in the latter part of the month, discovered that improved phosphor adherence could be obtained if the EC coating was washed with silver nitrate."

In the Patent Office proceedings, Bradley, who testified on behalf of Philco, in testimony given in 1961, ten years after the events in 1951, testified that the silver nitrate procedure referred to above "alone was sufficient to cure the difficulty" with phosphor adherence, (TR 415) and the Board (opinion p. 13) seems to have accepted this testimony. But the Philco records [quoted in plaintiff's trial brief (p. 48)] state that the silver nitrate proposal did *not* cure the difficulties.[15] (PX 7–A, LX 37.)

———

Thus, from Philco's contemporaneously written records, it must be concluded that, as of April, 1951, Philco was still faced with important unsolved problems in its efforts to practice photo-deposition.

5. *Philco's April 1951 demonstration and the photographs showing its results*

In April, 1951, Philco demonstrated one of its color tubes to Philco personnel, but not to the public or to anyone outside the Philco organization.

Pictures were shown on the tube, and photographs were taken of the pictures as they appeared on the tube face.[16]

Copies (color prints) of two of these photographs were offered in evidence and relied upon by Philco in the Patent Office proceedings, as Tiley Exs. 46 and 47, and were relied upon by the Board in its opinion in which it concluded that the Philco demonstration amounted to a reduction to practice. The originals (color transparencies) of these photographs were put into evidence by plaintiff at the trial as PX 10–C and PX 10–D, and constitute objective evidence of what the pictures looked like on the face of the Philco tube during the demonstration.

One of the pictures shown (PX 10–C; TX 46) was of a fruitbowl scene, based on a standard photograph widely used in the industry for color television testing. Another (PX 10–D; TX 47) was a scene including an American flag.

At the trial, important new evidence was introduced, bearing upon this photographic evidence of Philco's demonstration, including:

(a) An original fruitbowl slide, taken in the fall of 1950 (PX 34).

(b) A color bar chart transparency from the Philco files (PX 10–A).

(c) Original color pictures (transparencies) made by Herold in April, 1950, showing results obtained by RCA on its color television tubes (PXs 11, 12, 13).

(d) Testimony by plaintiff's experts Herold and Hardy and defendant's expert Bowie as to their respective evaluations of the Philco pictures.

15. The difficulties with phosphor adherence could not have been "solved" by the silver nitrate proposal by the time Philco made the phosphor screen for the tube AE–1 which it used in its April, 1951, demonstration. This is so because the silver nitrate proposal was first recorded in an entry by Payne dated March 17, 1951 (PX 33, TX 62, p. 35), but that was *later* than the date when the screen for tube AE–1 was made, February 21, 1951 (DX 9–A, p. 9).

16. In Philco's demonstration, a test apparatus including the picture tube was connected to a slide scanner located in another part of the building. Color slides in the scanner were used to generate electrical signals, which were carried over cables to the test apparatus, for reproducing pictures on the picture tube, based on the slides in the slide scanner.

(e) Testimony at the trial by Bradley and Gudis, former Philco employees.

For the reasons explained below, this evidence established that Philco's photographs (PXs 10–A, 10–C, 10–D, TXs 46 and 47) show poor results, and confirm the conclusion that Philco had not brought the method of the invention under control by the time of its April, 1951, demonstration.

*The original (Haines) fruitbowl slides*

Jesse H. Haines, who in 1950 and 1951 was an employee of Dumont Laboratories, testified that in the fall of 1950 he made a series of about 36 substantially identical pictures showing a scene including a bowl of fruit. The resulting color slides were widely used in the color television industry for test purposes. One such slide was later reproduced on the front cover of Electronics magazine for February, 1952. (PX 16.)

Haines produced at the trial a color slide, PX 34, which is one of the original fruitbowl slides which he made in the fall of 1950. (Haines also produced the original tablecloth which appears in the picture, and a portion of it is in evidence as PX 35.)

It is apparent that Philco used one of Haines' slides in its flying spot scanner in its April, 1951, demonstration [17] and that the colors of the fruitbowl scene which Philco sought in its April, 1951, demonstration to reproduce on the face of its picture tube are those shown in the original Haines fruitbowl slide, PX 34, which was not before the Patent Office.

It is now, for the first time, also clear that the colors actually obtained by Philco bear little resemblance to the colors which Philco sought to obtain.

Concerning the Philco fruitbowl transparency (PX 10–C), Herold testified as to its appearance in contrast with the Haines' slide, PX 34:

"Referring now to 10–C, the projection of the Philco fruitbowl picture, the colors in it are very poorly rendered in comparison to what a color picture ought to be. The color of the apple on the left is much the same as the color of the orange next to it and of the orange in the upper left and is very little different from the color of the banana. The two lemons which are in the picture simply have colors which are very much the same as the apples, thus the objects, the fruits in the picture, although they can be distinguished by their shape, as they could in a black-and-white picture, are hardly distinguishable one from the other by the color.

"The tablecloth, the candles and the grapes also in the fruitbowl are not very close replicas of the kind of colors that one would expect to see in a color television picture.

"The only color which does bear a resemblance to the colors as they ought to be in the picture are those of the teacups in the foreground.

"In summary then, the Philco picture is a very poor color picture and well below what one would expect of a color television picture tube in color fidelity.

"THE COURT: From my observation he has an awful lot of purple, various shades of purples, and not much else, except the cups look more blue, but everything else looks purplish to me, various shades of purple including the candlesticks, which I, from this distance would call purple."

Philco's expert Bowie did not disagree; he, also, characterized the coloration in the Philco fruitbowl picture, PX 10–C, as "poor."

17. The arrangement of the fruit in some of the fruitbowl slides differs slightly from the arrangement in others. The Haines fruitbowl slide used in the Philco demonstration had one slight difference from the Haines slide which is PX 34— one of the pieces of fruit (a banana) was in a different position.

*Philco's bar chart*

Plaintiff offered in evidence a color transparency, referred to at the trial as a "color bar chart," which was produced by Philco from its files subsequent to the Patent Office decision, relating to the Philco demonstration in April, 1951. This transparency, PX 10–A, bears the legend "AE 1," which is the number of the Philco demonstration tube.[18] It was not in evidence before the Board.

The bar chart transparency (PX 10–A), like the fruitbowl transparency (PX 10–C), shows very unsatisfactory color rendition.

Hardy, in testifying regarding the Philco bar chart (PX 10–A), stated that he considered it

" * * * a very unsatisfactory rendition of a color bar chart."

Hardy also testified regarding the tube data (TX 36; PX 7–A) for tube AE–1 and its relation to this Philco "AE–1" bar chart:

"A I note under remarks, 'General appearance, blue-green. Green phosphor very smooth. Red phosphor considerably broken up. Blue phosphor line also broken up in spots.' Reading this description of the screen I believe it correlates quite well with the non-uniformity that I observe in the slide, particularly in regard to the phosphor, red phosphor considerably broken up. This is clearly evident in the slide.

"Q Are you able to draw any conclusion with respect to whether or not in your opinion the phosphor deposition was satisfactory or unsatisfactory or any other condition?

"A *It was my conclusion that the phosphor deposition was unsatisfactory,* and furthermore since this is

AE1 and is a line index type of tube, it appears from the slide that the indexing system as a whole is not working adequately."

Bowie, too, characterized the coloration of Philco's "AE–1" bar chart (PX 10–A) as "poor."

*Herold's April, 1950, evidence*

There is also important new evidence introduced at the trial by plaintiff which provides a basis for comparison—evidence of the state of the art against which Philco's results can be measured.[19] This evidence consists of color pictures made by Herold in April, 1950, a year earlier than Philco's April, 1951, demonstration, showing the results obtained by RCA at the time of its public demonstration in Washington, D. C., of its color television picture tube (PXs 11, 12, 13). Of these, the picture which is of principal importance is one dated April 7, 1950, which shows a girl in a ski costume as seen on the face of RCA's three-gun picture tube. Herold's 1950 color picture, PX 13, evidences results much superior to the results shown in the Philco 1951 slides (PXs 10–C and 10–D). Herold testified

"In my opinion the ski girl picture, Exhibit P–13, is a good representation or a very good representation of a color picture. The colors are well saturated. The flesh tones come out well, and there are good reds and blues, and the greens, I think, are evidenced as satisfactory because the whites, because there is a color balance and if there were no green, one wouldn't be able to get a white so it has a balanced white. It has saturated blues, good reds, good flesh tones, good rendition of color.

---

18. In the Patent Office proceedings, Philco stated that the tube which it demonstrated in April, 1951, was one of tubes AE–1, AE–2 or AE–3, the screens for which were made on February 21, March 3 and March 12, 1951, respectively (Tiley patent office brief, DX 9–A, pp. 8, 9). According to a Philco report of a meeting of June 15, 1951 (PX 7–A), tube

AE–1 was the one "used in the previous demonstration."

19. A Philco document dated April 6, 1951 (PX 7–A) states:
 "*In general we must compare our tubes to the RCA tubes* and our system to the CBS system *to judge adequacy of quality.*"

\* \* \* \* \* \*

"On the other hand when I look at the two left-hand pictures, one of them the fruitbowl, the Philco picture, the other one the flag, 10A and 10C, is that correct?

"Q Those are 10C and 10D.

"A I consider them *very poor color pictures*. They look a little bit as if one color was completely missing. They are predominantly blue and bluish-purple. The candles which should be red are purplish. The apple is purplish. Objects which I think are oranges are purplish. The banana which should be yellow is a kind of a brownish-purple. The tablecloth next to what I recall in the fruitbowl slide I am familiar with as walnuts, you can't tell the walnuts from the grapes. They are the same color. The lime right above the apple which I remember as a bright green, is here a very drab, faded olive color.

"Addressing myself now to the lower left-hand one, the flag, the sky is blue. The leaves on the trees which I would expect to be green are purple. The lower foreground in the bottom of the picture which I would have expected to be green grass is blue. It doesn't resemble anything that I am familiar with in the way of ground covering.

"THE COURT: Is that supposed to be snow?

"THE WITNESS: Perhaps it is. If it is, it is blue snow. The object in the middle is difficult to distinguish, and the one place where something is clearly distinguishable is in the flag where it is obvious that the flag is a United States flag because we are very familiar with the color. In fact, however, the red stripes are purplish and the blue is a very dark blue.

"I should have mentioned in the upper slide and I am now on the bowl of fruit slide, and I should have mentioned that the one color in the upper slide which looks very much like the original to me are the two teacups in the foreground. These are a blue-green, an ocean-type of color, and I think the color rendition although there is a good deal of fuzziness in them, the color rendition is fairly close to the original. The remainder of the slide, the color renditions are not close to the original, and *I consider them very poor*."

This contrast between Philco's 1951 color pictures (PXs 10–C and 10–D) and Herold's 1950 picture (PX 13) is striking evidence of Philco's poor results.

*Bradley's testimony in 1966*

Bradley testified at the trial in 1966 that he recalled the appearance of the color picture tube in the Philco April, 1951 test, including its reproduction of the fruitbowl picture and the bar chart.

He testified that, in the Philco fruitbowl picture in evidence at the trial (PX 10–C), the candles were "Dark gray," whereas in the fruitbowl scene in April, 1951, they were "red and quite clearly so."

As to the bar chart picture in evidence (PX 10–A) Bradley testified that it "is a very dull picture, and I can scarcely see any color in it at all," but that the bar chart picture on the tube in 1951

"\* \* \* was very good, although not perfect, that is to say the colors were not quite so intense as I would have liked to have seen them, but they were far more intense than anything we see before us here."

He testified that he had a clear recollection of the kind of colors that he saw and the color character of the picture as he saw in April, 1951 (fifteen years earlier).

"THE COURT: He was very vivid in his testimony. It had bright green, bright blue, all but perfect. He said it wasn't quite perfect." [20]

20. On cross-examination it was brought out that Bradley had, on several occasions, in testifying on behalf of Philco and against RCA in other interferences, testified as to his vivid recollection of events many years earlier.

 Yet, in 1966, Bradley had difficulty remembering that he had testified in court

*Philco's effort to explain the appearance of its pictures on the ground that Kodachrome requires professional processing*

Although in the Patent Office proceedings Philco had relied importantly on its transparencies and the corresponding color prints (PXs 10–C, 10–D; TXs 46, 47) as evidence of its 1951 demonstration, at the trial it sought to escape the effect of the unfavorable comparison between them and those produced by Herold and Haines.

Philco sought to offer testimony by Bowie for the purpose of explaining away the poor quality of Philco's color pictures (PXs 10–A, 10–C and 10–D), on the ground that they were Kodachrome slides and Kodachrome slides were not suitable for processing by personnel other than by commercial facilities. However, Bowie was not qualified to give any meaningful testimony on the subject.

Philco then called Richard S. Gudis, a former Philco employee who in 1951 participated in taking the Philco slides in question (PXs 10–C, 10–D).[21] But his testimony was in conflict with the testimony which had been given in the Patent Office by Creamer. According to Creamer, the Philco slides were Kodachrome slides (TR 726); and Bowie's proposed testimony was based on this premise; according to Gudis the Philco slides were not Kodachrome slides but were instead Anscocolor.

*Philco's own photographs are the best evidence of Philco's results*

The conflict in the testimony between Philco's witnesses left in doubt the question of what type color film had been used in taking these pictures, but it is clear that the pictures were taken originally by Philco for the purpose of preserving a useful record of the demonstrations (TR 727),

> " * * *. in part as a record of the demonstration and in part as a record of the technical characteristics of the picture so that they would be useful to us in our later work, as a point of reference." (Creamer, TR 727).

Creamer testified that, at the time Philco's fruitbowl transparency was made, there was a substantially good correlation between it and the picture on the face of the tube, but—based on his 1961 recollection of Philco's 1951 results—he said that some fading had taken place (TR 730).

Philco's contention that its photographs have faded is answered by the unfaded appearance of Herold's and Haines' photographs (PXs 13, 34), which are even older than Philco's.

Unquestionably, the best evidence of the results which Philco actually attained in 1951 is the objective evidence represented by its own transparencies, PXs 10–A, 10–C and 10–D, not the subjective statements given by Philco personnel in their recollection testimony of 1961 and 1966. The transparencies (PXs 10–A, 10–C, 10–D) were produced from Philco's own files. They were made for the purpose of preserving a record of Philco's results, and Philco relied upon them in the Patent Office.

The conclusion is inescapable that Philco's results in 1951 were a poor reproduction of the subject matter which Philco sought to reproduce, and compared unfavorably with the results obtained a year earlier by RCA.

---

on behalf of Philco in Radio Corporation of America v. Philco Corporation, 201 F. Supp. 135 (E.D.Pa.1961), although he had testified in court on only two occasions (that being one of them) prior to the present case.

21. Gudis testified that the colors in Philco's slide PX 10–C "are not as vivid as they were on the face of the picture tube." However, the fruitbowl slide was used on many different occasions at Philco and Gudis had seen presentations of that scene 50 or 75 times, and he did not contend that he remembered the exact colors. Under the circumstances, any testimony by him 15 years after the event as to the vividness of the colors demonstrated by Philco in comparison to the colors shown in the slide PX 10–C is entitled to little weight.

6. *Records of Philco's later efforts confirm that the method had not been brought under control*

*Philco's unsolved problems continued after April, 1951*

If there was any doubt that Philco had, by April, 1951 (the date of its only demonstration prior to Law's filing date), failed to produce tubes which would accomplish the purpose of the tube development program, that doubt is removed by Philco's own statement reviewing the situation as of the end of June, 1951. The report by Creamer, dated June 27, 1951 (PX 7–A) states:

"The color tube situation was reviewed early in the month and *the situation with regard to tubes acceptable for demonstration units was rather sad.* Accordingly, a meeting at Lansdale, held June 4, outlined a general program stressing above all quality and uniformity in a limited number of tubes to be produced in the interval until July 15. Experimental work on new tube structures was accordingly cut down; only aluminizing studies being generally permitted. *The results of this program to date have. not produced any tubes which can fairly be said to fulfill the objectives of this program."*

The disappointment expressed in this Philco report does not support the Board's conclusion that Philco had, two months earlier, reduced the invention to practice. This document was *not* before the Board.

In these circumstances, evidence of what Philco did *after* the alleged reduction to practice—how its engineers reacted to the results they had obtained—can give a more dependable index of what those results really were than does recollection testimony long after the event.[22]

Accordingly, it is appropriate to examine Philco's admissions and other statements showing its course of action, contained in its documents subsequent to April, 1951. The following documents, *all of which are new evidence which was not before the Board,* confirm Philco's failure:

May 4, 1951

Report by Emerson (PX 7–A):

"Tipley stated that it looks like a complicated problem to apply index stripes over the illuminizing [sic] film."

This was an admission that Philco had not yet solved the problem of making a tube including an aluminum film, and points up Philco's unsolved problem in providing a conductive layer in its screens.

At the trial, the experts for RCA and Philco presented conflicting *technical* theories as to whether Philco's index tubes required a conductive layer as part of their screens, for purposes of deriving index signals. But the plain fact that Philco did require such a layer, as a *practical* matter, is shown by its persistent efforts to provide a conductive layer, either in the form of a transparent coating on the glass face of the bulb, or an aluminum layer.

The record also makes plain the fact that Philco, during the time here in issue, (a) was having great difficulty in practicing the method with screens having a transparent conductive coating and (b) did not know how to practice the method to make an operable tube with an aluminum layer.

May 18, 1951

Report by Emerson (PX 7–A):
*"The cause of some good index and some bad index at high anode voltages is still not known."*

22. Where, as here, the evidence shows that, following an alleged reduction to practice, the party claiming a reduction to practice was dissatisfied with the results·and was forced to depart from the techniques which it had been using, such evidence negates the alleged success. Collins v. Olsen, 102 F.2d 828, 834 (CC PA 1939).

June 29, 1951

Memorandum on Color Display Progress by Creamer and Moulton (PX 7–A):

*"We are not satisfied with performance very nearly the same as previously demonstrated."*

It was just two days prior to this memorandum that Creamer had reported on the "rather sad" situation (supra, p. 226).

July 13, 1951

Memorandum on Status of Direct Viewing Color Tube Project by Bradley (PX 7–A):

"Approximately two months ago it was decided that the middle of July would be an appropriate time for a demonstration. *Events since that time have made it desirable to postpone such a demonstration* until some of the developments contributing to the objective of improved performance could be brought to a successful conclusion."

July 13, 1951

Report by Emerson (PX 7–A):

"S. Moulton feels quite certain that *poor index signal* is directly attributable to the irridizing problem."

July 19, 1951

Memorandum on Direct Viewing Color Tube Project by Bradley (PX 7–A):

"The work of the past month or so has served to define certain *clear-cut* problems.

\* \* \* \* \* \*

"The second difficulty in order of importance is the *non-uniformity of index output* from the Lansdale screens. *The reasons for this are unknown at present* \* \* \*.

\* \* \* \* \* \*

*"It is characteristic of these screens that index is weak or absent over certain areas of the tube.*

\* \* \* \* \* \*

*" \* \* \* it is suspected that the cure of the trouble will not be difficult once the cause has been correctly determined.*

\* \* \* \* \* \*

"In the early days of the project this coating had too high a resistivity which reduced the index yield objectionably. When the coating was thickened so as to be more highly conducting the *phosphors would not adhere well.* This difficulty was at length solved by Sadowsky by improvements of technique of phosphor deposition. Later, it was discovered that upon opening a finished tube certain areas of the coating were non-conducting despite the fact that all screens were supposed to have been checked prior to processing."

September 14, 1951

Report by Emerson (PX 7–A):

"Tubes desired by Research should have the following characteristics:

\* \* \* \* \* \*

"Screen like tube No. 'BM–1.' However, that *screen was fortuitous."*

Note that this tube, which was received September 7, 1951, by Philco (PX 5, data sheet 106) and which was apparently considered good by Philco, was looked upon as an accident.

September 19, 1951

Memorandum by Bradley to Bocciarelli (PX 7–A):

"Two well defined and *extremely important problems* have emerged from our color tube research.

\* \* \* \* \* \*

"From a practical point of view these problems arise because *it is not known at present how to optimize or even accurately control the secondary emission properties of cathode ray tube screens."*

September 27, 1951 [the day following the filing of the Tiley patent application]

Memorandum by Creamer (PX 7–A):

*"Index yields are still erratic from tube to tube.*

\* \* \* \* \* \*

*"The demonstration on September 14 was deemed unsatisfactory,* and we are currently attempting to improve the

difficulties which were evident at that time."

It is significant that this "unsatisfactory" September 14, 1951 demonstration was the first demonstration by Philco following its April demonstration.

*Philco's records show that Philco failed to achieve reproducibility*

Analysis of Philco's tube data sheets and other documents, including those quoted in the previous section, and the screen-making records of Payne, show that, by the time of its alleged reduction to practice in April, 1951, and in fact by the end of July, 1951, Philco had failed to bring the method under control so as to be able to produce satisfactory tubes with reproducible results.[23]

Hardy, who had analyzed the day-to-day working records recording Payne's results in making Philco's screens, summarized them as follows:

"The general pattern that stands out clearly in these notes is one of lack of reproducibility, very erratic results, and in my opinion Payne was floundering, floundering very badly during this period, and had not brought this process under control."

Herold summarized Philco's results, saying

" * * * they were not reproducible. The screens were erratic and in general were not reliable, and they failed to achieve the objective of a controllable, a controlled screen deposition method."

Bowie sought to excuse Philco's failure to achieve reproducibility

THE COURT: Now there is an opinion as to reproducibility. What is your opinion as to reproducibility?

THE WITNESS: It is my opinion that at that time the program was not set up to seek reproducibility. This was an experimental program in which tubes of various types were being tried out in order to find out solutions, just for instance as in the case of the dilution of the green phosphor. There were purposeful variations being made, and I don't believe, therefore, that one can properly characterize these tubes with reference to reproducibility."

But in this testimony, Bowie did not answer the Court's question, or refute Herold's testimony. Certainly the fact that index yields were "still erratic from tube to tube" (supra, p. 227) by September 27, 1951, was not a "purposeful variation," and neither were the "broken up" phosphor lines or the predominantly "green" screens (supra, p. 214). Nor was Bradley reporting purposeful variations when on July 2, 1951, he wrote (PX 7–A, TX 20 [PX 1]):

"Early in the month a review of the tube situation showed that while tubes had been received which were satisfactory in each of the several characteristics, no one tube had yet been produced that was satisfactory in all of them at once. In order to demonstrate a satisfactory color display it was necessary that some improvement in tube quality be obtained."

Plainly, the objective of Philco's work was to develop the method to the point where the results would "be reproducible" (TX 25) but it failed in its efforts to do so.

---

After 1951, Philco continued for several years its experimental laboratory

---

23. The authorities are clearly to the effect that an important requirement of reduction to practice of a method invention is reproducibility of results. As stated in "Introduction to Interference Law and Practice" by Maurice A. Crews, Journal of the Patent Office Society, Vol. XLVI, No. 11, November, 1964, pp. 755, 770:

"Reduction to practice may be defeated if the results are not reproducible."

The requirement of reproducibility was stated by Tiley himself, several months prior to the date, April, 1951, of Philco's alleged reduction to practice. He specified that a method of making screens for such tubes must

" * * * be reproducible under factory conditions * * *." (TX 25).

work, endeavoring to develop a satisfactory method for making line screen index type color television picture tubes, but meeting with continuing difficulties (PX 7–B).

About the end of 1952, it considered changing its screening method from the front projection technique to a back projection technique, in hopes that "many of these difficulties could be eliminated," but decided to "exhaust all other possibilities first" (PX 7–B, LX 136, p. 4, dated December 23, 1952). This took the form of a final test of front projection, made in a period commencing in May, 1953. The results of that test, however, were clearly unsatisfactory (PX 7–B, LX 150, pp. 2, 3).

By mid-1953, Philco concluded that front projection was inadequate, and, at that time, dropped it in favor of back projection.[24]

Upon changing to back projection, Philco found it necessary to make a further basic change—so as to apply the phosphor *after* exposing the photosensitive material, not *before*—which method departed from the steps of the count. This amounted to Philco's dropping its efforts to practice the invention (PX 42–A, Sadowsky deposition, p. 46; Philco's Payne patent, applied for August 25, 1953, PX 7–E [LX 132]).

After 1953, Philco still continued its experimental work on the project, and about 1956, while work on the project "was still going on to some extent," Philco published a series of papers describing its tube (LX 177, PXs 51, 60). Some time after that, it dropped the project, never having sold a color television receiver with a Philco picture tube made by the method of the count.

## IV. VALIDITY OF CONVERSION FROM JOINT TO SOLE APPLICATION

The statutory basis for the conversion of a joint patent application to a sole application is 35 U.S.C. § 116 which provides in pertinent part:

> Whenever a person is joined in an application for patent as joint inventor through error, or a joint inventor is not included in an application through error, and such error arose without any deceptive intention on his part, the Commissioner may permit the application to be amended accordingly, under such terms as he prescribes.

▇▇▇ It has been held that Congress intended the expression, "error * * * without any deceptive intention," not only to replace the previously used and more cumbersome expression, "inadvertence, accident or mistake," but also to relieve applicants from the narrow construction which the courts had given to that expression. Application of Schmidt, 293 F.2d 274 (48 C.C.P.A. 1140, 1961).

▇▇▇ The Board of Patent Interferences found the record before it failed to show that "anyone had deceptive intent in filing the Rosenthal and Law application," or that there was "undue delay (lack of diligence) in moving to convert the application to a Law sole application." This court has reviewed all of the evidence related to this issue and has independently concluded that the proofs in nowise support the allegation of "deceptive intention."

Further, defendant Philco argues the proofs establish that there had been no conception at RCA of the invention in issue before Law and Rosenthal began

---

24. A Philco memorandum dated June 30, 1953, to its vice president D. B. Smith from Fink and others (PX 7–B, LX 138) stated:

> "It is the opinion of the undersigned that the Mark I Apple tube ('front-projection') while of great value in demonstrating the capabilities and limitations of the Apple system, is *not a satisfactory device*, primarily because it has proved *so difficult to reproduce satisfactory characteristics in its screen structure*. Since the Mark II ('*back-projection*') is expected to relieve this difficulty, and to surpass the Mark I tube in many other respects as well, it is proposed *to discontinue work on the Mark I Apple system* effective with the beginning of the Mark II program, and that all available personnel be devoted to the Mark II tasks outlined below."

**230**

working together in November, 1950, and hence there was no "error" in the joinder of inventors in the filing of the Rosenthal and Law application. Thus, Philco contends the Board erred as a matter of law in allowing an application change to cover the "non-inventive proposal" made by Dr. Law on November 15, 1948. This argument is disposed of by our finding in Part I of this opinion that Law did conceive the invention in issue on November 15, 1948.

### CONCLUSIONS OF LAW

1. Harold B. Law, not John W. Tiley, was first to conceive the invention defined by the count of Interference No. 88,472.

2. Tiley was not an original inventor, but derived the invention from Law via Sadowsky. Priority of invention, on this ground, is to be awarded to Law.

3. Defendant, as assignee of Tiley patent application Serial No. 248,356, is not entitled to obtain a United States patent on the invention defined by said count.

4. Law, not Tiley, was first to reduce the invention to practice:

(a) Law constructively reduced the invention to practice by the filing of patent application Serial No. 239,359 on July 30, 1951.

(b) The Board of Patent Interferences erred in concluding that Tiley reduced the invention to practice in April, 1951.

(c) The invention was not reduced to practice by or on behalf of Tiley prior to July 30, 1951.

5. Priority of invention is to be awarded to Law on the ground that Law was first to conceive the invention and first to reduce it to practice.

6. The sole Law application did not result from improper conversion of the originally filed joint Law-Rosenthal application.

7. Law was the true, original, first and sole inventor of the invention defined by the count of Interference No. 88,472, and plaintiff, as assignee of Law

application Serial No. 239,358, is entitled to obtain a United States Patent for said invention; and the Commissioner of the United States Patent Office is to be authorized and directed to grant such a patent to plaintiff upon said Law application, including the claim constituting said count.

A form of order is to be submitted.